# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 7, 2010 Session Heard at Centerville[1]


## STATE OF TENNESSEE v. GENARO DORANTES


**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2006-D-3184      Steve R. Dozier, Judge**

---

**No. M2007-01918-SC-R11-CD - Filed January 25, 2011**

---


The defendant, who was extradited from Mexico to face charges for aggravated child abuse and felony murder by aggravated child abuse, was convicted for each offense. The trial court imposed sentences of twenty-two years and life, respectively, to be served consecutively. The Court of Criminal Appeals reversed the conviction for aggravated child abuse, finding the evidence to be insufficient, but upheld the felony murder conviction. This Court granted applications for permission to appeal by both the State and the defendant. Because the circumstantial evidence was sufficient to support the convictions for both aggravated child abuse and felony murder, the judgment of the Court of Criminal Appeals is reversed in part and affirmed in part. More specifically, the conviction for felony murder is affirmed, and the conviction for aggravated child abuse is reinstated. No other issues warrant the grant of a new trial on either offense. The sentences imposed by the trial court for each of the two offenses are affirmed.


**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed in Part and Affirmed in Part**


GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.


Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball and John H. Bledsoe, Assistant Attorneys General; Victor S. Johnson, III, District Attorney General; Katrin N. Miller and Brian Holmgren, Assistant District Attorneys General, for the appellant, State of Tennessee.

---

[1] Oral argument was heard in this case on October 7, 2010, in Centerville, Hickman County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Jeffery Allen Devasher (on appeal), Nashville, Tennessee, and Amy D. Harwell and Ross Alderman (at trial), Nashville, Tennessee, for the appellee, Genaro Dorantes.

## OPINION
### Facts and Procedural History

Luis Osvaldo Cisneros (the "victim") was born in Mexico on July 16, 1998, the fourth child of Jose Luis Cisneros Servantes ("Cisneros") and his wife, Martha Patlan-Cano ("Patlan"). Shortly after the victim's birth, the parents separated, and Cisneros moved to Houston, Texas, leaving his family in Mexico. In 2001, the victim and the three other children joined Cisneros in Houston. On June 18, 2002, one of the children, Martha Bernece Cisneros Patlan, observed Patlan and Genaro Edgar Espinosa Dorantes (the "defendant") abduct the victim from Cisneros' yard, place him in a black vehicle, and drive away. At the time, the victim, not yet four years of age, was described as "normal and healthy." He no longer wore diapers. Cisneros reported the abduction to the Houston police and, about two months later, traveled to Nashville in an unsuccessful effort to find the victim.

Patlan, who had given birth to a son fathered by the defendant on October 20, 2001, in Nashville, was "supposedly" staying at the apartment of the defendant's mother, but much of her time involved travel with the defendant. They had no established residence. In February of 2003, Patlan visited the apartment of her sister, Antonia Patlan ("Antonia"),[2] who had lived in Nashville for some nine years. Appearing concerned about the victim, Patlan asked Antonia for "money to buy a cream" to treat his injuries, explaining that while she was in the bathroom, "she heard her child crying out" when he "burned himself with some corn cobs that she was cooking." Antonia gave Patlan forty dollars to purchase medicine. One week later, Patlan returned to the apartment and asked Antonia for permission to store some toys, stating that she was about to take a trip to Florida. When Antonia asked to see the victim, Patlan led her to a white van parked outside and driven by the defendant. Antonia entered the van and saw the victim lying on his side in an apparent effort to protect the area around his buttocks – "in a position like maybe not to hurt himself." She touched his head and asked, "what happened to you, my child?" The victim provided an unintelligible response. At that point, the defendant interrupted, saying "let's go, let's go woman, let's go, woman" to Patlan before driving away. In consequence, Antonia was unable to determine the nature or extent of the victim's injuries.

A few days later, on February 20, 2003, Patlan approached another one of her sisters, Maria Patlan-Cano ("Maria"), at the Nashville restaurant where she worked, claiming that the victim "was very sick" and in need of medication. Patlan was accompanied by the

---

[2] Antonia Patlan, Maria Patlan-Cano, Jose Luis Cisneros Servantes, and Martha Bernece Cisneros Patlan testified at trial with the assistance of an interpreter.

victim, her baby by the defendant, and her ten-year-old daughter by Cisneros, who by that time was somehow in Patlan's physical custody. After tearfully explaining that the victim had been burned while she had been cooking corn on the cob, Patlan expressed her fear to Maria that the victim might die. In response, Maria gave Patlan food and two hundred dollars, but insisted upon seeing the victim. When Maria went outside, however, the defendant, who was driving the white van, was reluctant to allow her to see the victim, claiming that he was blocking traffic. After the defendant moved the vehicle out of the street, Maria opened the door, observed the victim, and screamed, "why [is] the child like that?" Maria, who had described the victim as "chubbier" and "very happy" when she had last seen him in Mexico, noticed that he was very thin and that a foot was bandaged. He was positioned "[o]n his knees with his feet behind him" but did not move. When Maria asked the defendant why he had not provided medicine to the victim or taken him to the doctor, the defendant replied that "since he wasn't his father[,] he didn't have any reason to want to make him get better." Maria then asked why the defendant had taken the victim away from his father if he did not intend to provide for his care. According to Maria, the defendant replied that "he didn't want to bring him[,] but that bitch [Patlan] wanted it to happen." At that point, Patlan directed Maria to get out of the van because the defendant was angry. When Maria complied, the defendant drove away "really fast."

Maria tried to get the license plate number in order to provide it to the police, but, because of the defendant's sudden departure, was unable to do so. Afterward, she asked her brother-in-law, Juan Sanchez ("Sanchez"), to contact the police and report her observations about the victim's health. Sanchez called 911; however, because of the language barrier, there was a delay in the processing of the information to the proper authorities within the department. Initially, in addition to an unidentified male child, Patlan was also thought to be a victim. After the report, patrol officers were notified, but the matter was not immediately assigned as a high priority.

Detective Sara Bruner of the Youth Services Division of the Metro Police Department had the responsibility for investigating child abuse and neglect cases and deaths of children twelve and under. She contacted Sanchez, who provided her with the victim's name and urged her "to find him." As a result of their conversation, on February 21, 2003, Detective Bruner issued a notice for officers to be on the lookout for the van being driven by the defendant. Her investigation was to include not only the victim, but also the other two minors in the custody of Patlan and the defendant.

On February 23, 2003, three days after the initial report to the police, Jerry Moore of the Metropolitan Park Police was approached by a visibly shaken woman who had observed the body of a child on a grassy surface behind a mound of dirt in West Park in Nashville. The mound blocked the view of the body from the road and parking lot. Officer Moore

found the body and secured the scene before Metro Police Detective Brad Corcoran of the Homicide Division arrived to conduct the investigation. No shoes were on the body, which was otherwise clothed. Because no grass stains were on the socks or pants and the body was not covered by the snow that had fallen during the night, Detective Corcoran deduced that the body had been placed at that location only a short time before its discovery. Later, Sanchez identified the body as that of the victim. On the following day, arrest warrants were issued for the defendant and Patlan. Despite substantial media coverage, including the mention of the crime on the "America's Most Wanted" television show, which resulted in several tips, the police were unable to locate either the defendant or Patlan.

Dr. Amy McMaster, the Deputy Chief Medical Examiner for Davidson County, who had special training in the interpretation of injuries, performed the autopsy the day after the body was found. She discovered that the victim was wearing a diaper at the time of his death and had bandages and a piece of cloth wrapped around his feet. The autopsy indicated that the victim had received "multiple, multiple" injuries to "virtually every surface of [his] body," and had also suffered serious burns to entire areas of his feet, which were wrapped in elastic bandages and covered by socks. The nature of the numerous injuries, including horrific burns of "full and partial thickness,"[3] was illustrated by graphic photographs taken during the autopsy. After examining the contents of the diaper, which concealed the more severe burns, Dr. McMaster speculated that its primary purpose was to absorb blood that was probably caused by the scabbing and infection of the extreme burns to the entire area of the buttocks, rear upper thighs, and genitals.

According to Dr. McMaster, the burns were altogether inconsistent with injuries caused by a cooking accident and were consistent with "burn [im]mersion," the result of the victim, likely in a sitting position with knees raised, having been intentionally forced into a liquid over 150 degrees for at least one second. The pattern of some of the "satellite" or splash burns suggested that the victim kicked and resisted as his buttocks and feet entered the water. In Dr. McMaster's opinion, the burns, between days and weeks old, were so serious that the victim could not have been able to walk or sit without painful consequences. The infection caused by the burns and loss of skin had damaged the victim's internal organs, which were failing at the time of his death. Dr. McMaster also found scars on the victim's face and multiple bruises and puncture wounds on other areas of his body. In her opinion, the puncture wounds were the result of "some type of pointed instrument." The injuries to the skin, dozens in number, were at different stages of healing at the time of the victim's death.

---

[3] Partial thickness burns, according to Dr. McMaster, are second degree burns, which do not destroy the cells capable of regenerating the skin. Full thickness, or third degree burns, involve the destruction of nerve endings, and the skin will not regenerate.

The examination also revealed that the victim had sustained blunt trauma injuries to the brain and skull. According to Dr. McMaster, the swelling to the brain indicated that the head injuries had been recently inflicted. She determined that the skull fracture, which involved internal and external bleeding, was the most serious of his injuries. In her opinion, the victim lived no more than two hours after being struck by the blow. Because the victim was immobile due to the extensive nature of the burns, she concluded that the blunt force had to have been inflicted by another individual rather than being accidental in nature. Dr. McMaster expressed the further view that the victim had suffered a blunt trauma to his hand, which was swollen and discolored. This injury was consistent with the victim attempting to protect himself and shield his body from attack. She also found an older contusion on the front portion of his brain, which was likely sustained six to seven weeks earlier.

Dr. McMaster found a therapeutic level of naproxen – possibly Aleve or Antiprox – in the victim's body. She believed that the "fluid accumulated in different body spaces" indicated that the victim would have ultimately died from the infection due to the burns; she speculated, however, that "with immediate treatment, he likely could have survived" the burns. She also found that he was malnourished, weighing only thirty-four pounds at the time of his death, which was far less than the average weight for a child his age. "[H]is ribs were very easily seen beneath the skin," and only a small amount of brown and gray thick fluid was found in his stomach. Dr. McMaster classified the cause of death as battered child syndrome, a term "used to describe a child . . . subjected to repeated bouts of severe physical abuse."

Carla Aaron, the Regional Administrator for the Department of Children's Services in Davidson County, who had training and experience in child abuse cases and a familiarity with the procedures involved in reporting the suspected abuse or neglect of children to law enforcement, the Juvenile Court, or the District Attorney's Office, confirmed that her department had not received any notification of the victim's circumstances until after his death. After reviewing the autopsy photographs, she concluded that if any medical provider had been called on to treat the injuries the victim had sustained, they would have "absolutely" reported the incident to her department for investigation.

Approximately four months after the discovery of the body, a Davidson County Grand Jury returned a two-count indictment for felony murder during the perpetration of aggravated child abuse. Count One alleged that the defendant and Patlan "did kill [the victim] during the perpetration of or attempt to perpetrate Aggravated Child Abuse, in violation of Tennessee Code Annotated § 39-13-202." Count Two alleged that the defendant and Patlan "did knowingly, other than by accidental means, treat [the victim], a child six (6) years of age or less in such a manner as to inflict injury, and the act of abuse resulted in serious bodily injury to the child, in violation of Tennessee Code Annotated § 39-15-402."

On February 13, 2006, almost three years after the victim's death, Sanchez reported to Detective Bruner that Patlan was in Mexico. On April 5, 2006, Katrin Miller, Assistant District Attorney General for the 20th Judicial District, submitted applications for the extradition of the defendant and Patlan, based specifically upon the charges for felony murder committed in the perpetration of or the attempt to perpetrate aggravated child abuse and for aggravated child abuse. The affidavit in support of the request to extradite also included the following language:

> Both [the defendant and Patlan] are criminally responsible as a party to the offenses of felony murder and aggravated child abuse if the offenses were committed by the defendants' own conduct, by the conduct of another for which the defendants are criminally responsible, or by both.

The extradition agreement, executed by the appropriate authorities on May 30, 2006, made specific reference to the charges in the indictment. The terms authorized and directed the extradition of the defendant to face charges of "homicide in violation of criminal code 39-13-202 and . . . child abuse described by criminal code 39-15-402." The Federal Bureau of Investigation assisted in the extradition process and, in July of 2006, the defendant and Patlan were returned to Nashville.

Some five months later, on December 7, 2006, the District Attorney General's Office filed a superceding indictment against the defendant and Patlan that included two additional counts for felony murder by aggravated child neglect, an offense not specified in the extradition request or in the extradition agreement. Upon motion by the defense, however, and a concession by the office of the District Attorney General that the new charges were prohibited by the terms of the extradition agreement, the trial court entered an order of dismissal as to those two counts.[4]

The defendant and Patlan were tried jointly on the charges set out in the original indictment. The State, through the witnesses previously identified in this opinion, prosecuted the offenses based entirely upon circumstantial evidence, including expert testimony. There were no eyewitnesses to any of the allegations of abuse. Moreover, neither the defendant nor

---

[4] In United States v. Rauscher, 119 U.S. 407, 429-30 (1886), the United States Supreme Court held that the courts of the United States may not try a defendant who was extradited from another country for a crime not listed in the extradition agreement. This doctrine of specialty prohibits the prosecution for crimes which were not the basis for extradition. United States v. Levy, 947 F.2d 1032, 1034 (2d Cir. 1991). Further, Article 17 of the extradition treaty between the United States and Mexico specifically provides that an individual extradited under the treaty "shall not be detained, tried, or punished . . . for an offense other than that for which extradition has been granted" absent an exception, none of which apply to these circumstances. Extradition Treaty, U.S.-Mex., art. 17, ¶ 1, May 4, 1978, 31 U.S.T. 5059.

Patlan made incriminating statements to the police which were admitted as evidence. Further, the defense elected not to offer proof at the trial.

During closing argument, the State, precluded from prosecution based upon aggravated child neglect, argued that the death of the victim was the result of abuse and relied upon the surrounding circumstances to establish that the defendant and Patlan either caused or were mutually culpable for his death under the alternative theory of criminal responsibility. In response, the defense argued that the State had proved little more than the mere presence of the defendant some three days before the body was found and, further, had offered no evidence of the requisite shared intent to support the theory of criminal responsibility for the conduct of another. At the conclusion of the proof and the arguments of counsel, the trial court instructed the jury as to felony murder, aggravated child abuse, and criminal responsibility.[5]

---

[5] After instructing the jury on the elements necessary to support a conviction for felony murder and aggravated child abuse, the trial court charged the jury using language in substantial compliance with the statutes governing criminal responsibility, Tenn. Code Ann. §§ 39-11-401 & -402 (1997), and facilitation of a felony, Tenn. Code Ann. § 39-11-403 (1997):

The defendant is criminally responsible as a party to an offense if the offense was committed by the defendant's own conduct, by the conduct of another for which the person is criminally responsible, or by both. Each party to the offense may be charged with the commission of the offense.

The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense. Mere presence is not sufficient to find a defendant guilty for being criminally responsible for an offense committed by the conduct of another. However, presence of the defendant is not required.

A person who commits the offense of facilitation of a felony is guilty of a crime. For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant knew that another person intended to commit the specific offense, but did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; and
(2) that the defendant furnished substantial assistance to that person in the commission of the felony; and
([3]) that the defendant furnished such assistance knowingly.

(continued...)

-7-

Following its deliberations, the jury found Patlan and the defendant guilty of both aggravated child abuse and first degree felony murder by aggravated child abuse. As to the defendant, whose appeal is separate from the Patlan case,[6] the trial court imposed a mandatory life sentence for first degree murder and a consecutive sentence of twenty-two years for the aggravated child abuse conviction.

On direct appeal, the Court of Criminal Appeals reversed the defendant's conviction for aggravated child abuse, finding the evidence to be insufficient and more specifically observing that the State had failed to offer any proof that the defendant had actually inflicted the injuries causing the death of the victim. The Court of Criminal Appeals, however, affirmed the first degree murder convictions, concluding that the crime of aggravated child abuse, although different from child neglect, included "aggravated child abuse through neglect":

> Our review of the record shows that the State never argued that [the defendant] inflicted the victim's fatal injuries and did not offer any proof in support of this theory. . . . Accordingly, the conviction for felony murder based on a theory of aggravated child abuse through infliction of injury and the conviction for aggravated child abuse are not supported by the proof in this case.
>
> . . . .
>
> [T]he evidence[, however,] was sufficient to support [the] conviction for felony murder during the perpetration of aggravated child abuse through neglect. The evidence showed that [the defendant] knowingly failed to provide the victim with any medical assistance which resulted in the victim's serious bodily injuries.

State v. Dorantes, No. M2007-01918-CCA-R3-CD, 2009 WL 4250431, at *9-10 (Tenn. Crim. App. Nov. 30, 2009). In summary, our intermediate court ruled unanimously that the circumstantial evidence was insufficient to support a conviction of aggravated child abuse. On the other hand, the majority of the panel of the Court of Criminal Appeals, over the

---

[5](...continued)
The jury was also instructed on lesser included offenses, including second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide under Count 1. As to Count 2, the trial court also charged aggravated assault, reckless aggravated assault, child abuse, assault, and facilitation.

[6] The appeal of Martha Patlan-Cano, State v. Patlan, M2008-02515-CCA-R3-CD, was heard by the Court of Criminal Appeals on June 22, 2010.

dissent of Presiding Judge Joseph M. Tipton, held that a murder during the commission of aggravated child abuse included murder during the commission of aggravated child abuse "through neglect," relying on State v. Hodges, 7 S.W.3d 609 (Tenn. Crim. App. 1998), a case involving the interpretation of the 1995 version of the felony murder statute, which was amended prior to the victim's death.

The State applied for permission to appeal to this Court, arguing that the Court of Criminal Appeals had erred by holding that the evidence was insufficient to support a conviction for aggravated child abuse. The defendant also filed an application for permission to appeal, arguing that when the evidence is insufficient to support a conviction for aggravated child abuse, as determined by the Court of Criminal Appeals, a conviction for felony murder based upon aggravated child abuse cannot stand; secondly, the defendant asserted that a 1998 amendment to the felony murder statute, which made a distinction between a felony murder based upon aggravated child abuse and a felony murder based upon aggravated child neglect, precluded the extension of the former to the latter; and, thirdly, the defendant asked this Court to determine the propriety of a conviction for felony murder based upon aggravated child abuse absent any instructions defining aggravated child abuse by neglect. This Court granted both of the applications.

### Standard of Review

"When considering a sufficiency of the evidence question on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007). "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).

In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958). Ultimately, however, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and[, moreover,] the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184

S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457 (citations omitted)). On appeal, the court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). The standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." Hanson, 279 S.W.3d at 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)).

Years ago, Special Justice Erby Lee Jenkins wrote expressively on behalf of this Court, admonishing the finder of fact in criminal cases to exercise particular caution in the prosecution of cases based entirely upon circumstantial evidence:

> In order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone. A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt. Mere suspicion and straws in the wind are not enough for circumstances take strange forms. Under our form of government and the administration of criminal justice, the defendant is clothed with a mantle of innocence and that presumption of innocence hovers over and protects him throughout the trial. Until this is overturned by strong proof of his guilt beyond a reasonable doubt, not an imaginary or captious doubt but an honest doubt engendered after a consideration of all the evidence so that the minds of the jurors cannot rest easy as to the certainty of guilt, he is entitled to an acquittal.

State v. Crawford, 470 S.W.2d 610, 613 (Tenn. 1971). The Crawford standard purportedly required the State to prove facts and circumstances "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 612. This language has long been applied in Tennessee to criminal cases, particularly those cases in which the sufficiency of the circumstantial evidence is at issue. Recently, however, this Court pointed out the inconsistency between the terminology employed in Crawford and its progeny and the standard of proof applied by the United States Supreme Court when the evidence is solely circumstantial. See State v. James, 315 S.W.3d 440, 455 n.14 (Tenn. 2010) (observing that, while the Crawford standard has been used repeatedly in this state, the federal courts have held that the government has no duty to exclude every other hypothesis except that of guilt).

Significantly, the Supreme Court has specifically rejected the notion "that the prosecution [i]s under an affirmative duty to rule out every hypothesis except that of guilt

beyond a reasonable doubt." Jackson, 443 U.S. at 326.[7] In Jackson, the Supreme Court cited with approval Holland v. United States, 348 U.S. 121, 139-40 (1954), a case holding "that where the jury is properly instructed on the standards for reasonable doubt," an additional instruction that circumstantial evidence "must be such as to exclude every reasonable hypothesis other than that of guilt . . . is confusing and incorrect." In Holland, our highest Court made the following observation:

> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

Id. at 140; see also Charles Alan Wright & Peter J. Henning, 2A Federal Practice & Procedure: Criminal § 411 n.1 (2009) (hereinafter "Wright & Henning") (observing that the phrase "direct evidence" is now more commonly used than the traditional phrase "testimonial evidence").

The federal courts of appeal have followed the Supreme Court's directive, consistently holding that direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence. See, e.g., United States v. Kelley, 461 F.3d 817, 825 (6th Cir. 2006) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."); United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) ("It is not necessary that the evidence exclude

---

[7] While recognizing that convictions for criminal offenses might be based entirely upon circumstantial evidence, our Court of Criminal Appeals recited what has become standard language in practically all of our reported cases that address the sufficiency of circumstantial evidence:

> In such a case, the evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." In addition the evidence "must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt." In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt."

Dorantes, 2009 WL 4250431, at *7 (citations omitted).

every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."); United States v. Nelson, 419 F.2d 1237, 1241 (9th Cir. 1969) ("Since circumstantial and testimonial evidence are indistinguishable so far as the jury's fact-finding function is concerned, *all* that is to be required of the jury is that it weigh all of the evidence, direct or circumstantial, against the standard of reasonable doubt."). "Thus, though it is said that circumstantial evidence is to be scrutinized with the utmost care, and nonlawyers are suspicious of it, the courts reject the view that circumstantial evidence has less probative value than direct evidence." Wright & Henning, § 411.

We specifically adopt the standard enunciated by the United States Supreme Court as applicable to prosecutions in this state. In practice, the distinction between the federal standard and the "reasonable hypothesis" language used in our state has rarely made a difference; therefore, there has been little reason to refine our standard of review by voicing disapproval of much of the terminology used in Crawford.[8] This case, however, may qualify as one of those rare instances where the application of the federal and state standards could result in a different outcome, particularly in view of the State's election to extradite the defendant based upon the two counts founded in aggravated child abuse rather than aggravated child neglect.

**Development of the Law Applicable to Child Abuse and Neglect**
Prior to the Criminal Sentencing Reform Act of 1989, the statute governing cases of child abuse and child neglect provided as follows: "Any person who maliciously, purposely, or knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such manner as to inflict injury or neglects such a child so as to adversely affect its health and welfare is guilty of a misdemeanor . . . ." Tenn. Code Ann. § 39-4-401(a) (1982) (repealed by Act of May 24, 1989, ch. 591, § 1, 1989 Tenn. Pub. Acts 1169). Our courts treated abuse and neglect as two separate offenses. See State v. Smith, C.C.A. No. 1153, 1990 WL 134934, at *3 (Tenn. Crim. App. Sept. 20, 1990), no Tenn. R. App. P. 11 app. filed.[9]

_____

[8] The trial court instructed the jury on circumstantial evidence using some of the language from Crawford: "the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince beyond a reasonable doubt that the defendant is the one who committed the offense."

[9] The 1989 Act included the earlier version of the child abuse and neglect statute but also created a statute defining aggravated child abuse, a felony, for those committing child abuse resulting in severe bodily injury or with a deadly weapon. See 1989 Tenn. Pub. Acts at 1235-36 (codified at Tenn. Code Ann. §§ 39-15-401 & -402 (1991)).

In 1988, our first degree murder statute included death as a result of child abuse, providing, in part, as follows:

> It shall also be murder in the first degree to kill a child less than thirteen (13) years of age if the child's death results from one (1) or more incidents of a protracted pattern or multiple incidents of child abuse committed by the defendant against such child, or if such death results from the cumulative effects of such pattern or incidents.

Tenn. Code Ann. § 39-2-202(2) (Supp. 1988) (repealed by Act of May 24, 1989, ch. 591, § 1, 1989 Tenn. Pub. Acts 1169).[10] In 1992, however, this Court ruled that this statute was unconstitutional. State v. Hale, 840 S.W.2d 307, 313 (Tenn. 1992).[11] In response, the General Assembly amended the first degree murder statute to provide, in part, as follows: "First degree murder is: . . . (4) A reckless killing of a child less than thirteen (13) years of age, if the child's death results from aggravated child abuse, as defined by section 39-15-402, committed by the defendant against the child." Act of May 6, 1993, ch. 338, § 1, 1993 Tenn. Pub. Acts 537 (codified at Tenn. Code. Ann. § 39-13-202(a) (Supp. 1993)). Effective in 1995, however, the legislature again amended the first degree murder statute to provide in part as follows: "First degree murder is: . . . (2) A killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy[.]" Act of May 24, 1995, ch. 460, § 1, 1995 Tenn. Pub. Acts 801 (codified at Tenn. Code Ann. § 39-13-202(a) (Supp. 1995)) (emphasis added).

In Hodges, the Court of Criminal Appeals interpreted the 1995 statute. In that case, a two-year-old died of intentional blunt force trauma to the head and torso inflicted by either the mother or the stepfather – the sole custodians of the victim. Hodges, 7 S.W.3d at 614.

---

[10] After the 1989 Act and a subsequent amendment in 1991, see Act of May 8, 1991, ch. 377, § 2, 1991 Tenn. Pub. Acts 610, the relevant portion of the first degree murder statute read as follows:

> First degree murder is: . . . (4) A killing of a child less than thirteen (13) years of age, if the child's death results from a protracted pattern or multiple incidents of bodily injury committed by the defendant against such child and the death is caused either by the last injury or the cumulative effect of such injuries.

Tenn. Code Ann. § 39-13-202(a) (1991).

[11] In State v. Maupin, 859 S.W.2d 313 (Tenn. 1993), after the Court of Criminal Appeals had reversed a conviction for child abuse murder under the 1988 statute because the proof showed neglect rather than abuse, this Court specifically acknowledged "that the evidence [wa]s insufficient to sustain a conviction of murder in the first degree" even if the statute had been upheld as constitutional. Id. at 315.

Much like the case before us, the State was unable to prove which of the two administered the fatal blows, but, as in this case, "there [could] be no mistake that an act of abuse" caused the victim's death. Id. at 620. While affirming convictions for felony murder and aggravated child abuse, the Court of Criminal Appeals interpreted Tennessee Code Annotated section 39-15-202(a) (Supp. 1995) and addressed "child abuse as defined in § 39-15-401" when serious bodily injury results, as described in section 39-15-402(a)(1). The holding in Hodges stood for the proposition that a prosecution for a killing that occurred during the commission of "aggravated child abuse" encompassed a death caused by either abuse through the infliction of injury or abuse through neglect of a child "'so as to adversely affect the child's health and welfare,' resulting in serious bodily injury." 7 S.W.3d at 622-23.[12] Obviously, the majority of the Court of Criminal Appeals in the case before us relied on the Hodges ruling.

Effective July 1, 1998, however, our General Assembly amended the felony murder statute by adding aggravated child neglect to the list of felonies upon which a felony murder charge could be based: "First degree murder is: . . . (2) A killing of another in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]" Act of Apr. 29, 1998, ch. 1040, § 3, 1998 Tenn. Pub. Acts 911 (codified at Tenn. Code Ann. § 39-13-202(a) (Supp. 1998)) (emphasis added).[13] This statute was in effect at

---

[12] In State v. Mateyko, 53 S.W.3d 666 (Tenn. 2001), which involved charges filed in 1997 and an interpretation of the legislation in existence at that time, this Court cited Hodges with approval and held that

> child abuse and neglect [under the statute] is a single offense that may be committed through one of two courses of conduct: child abuse through injury and child abuse through neglect. Although the criminal code [in 1997] contains no specific offense labeled "child neglect," we will generally refer to the child abuse through neglect prong of [the statute] as "child neglect" for ease of reference.

Id. at 668-69 n.1 (citing Hodges, 7 S.W.3d at 622) (emphasis added).

[13] House Bill 3154 was "brought to [the legislature] by the District Attorneys General Conference [to] separate[] the offense of aggravated child abuse and neglect into two separate offenses [and] make[] it clear that aggravated child neglect is punishable by the same penalty as aggravated child abuse." Statement of Rep. John Hood, House Judiciary Committee, Feb. 25, 1998 (emphasis added). The original version stated in section 1(a)(2) that "[a] deadly weapon is used to accomplish the act of abuse or neglect," but Representative Hood successfully introduced an amendment to delete the phrase "or neglect," explaining that a deadly weapon would only be used in the context of abuse, not neglect. Id. When the proposal reached the floor of the House, Representative Hood stated that the legislation ensured "that aggravated child neglect is punishable by the same penalty as aggravated child abuse; also that child neglect is punishable by the same penalty as child abuse and that aggravated child neglect is an offense that triggers the felony murder rule."

(continued...)

all times pertinent to the prosecution of the defendant and Patlan. Importantly:

> When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.

Tenn. Code Ann. § 39-11-112 (2010). Thus, even though the law changed between the commission of the charged offenses and the trial of the defendant, the law applicable at the time of the events leading to the victim's death governs.

In his dissent to the Court of Criminal Appeals' opinion in this case, Judge Tipton observed that the 1998 amendment by the General Assembly was

> significant in the context of separating aggravated child abuse from aggravated child neglect when considering what constitutes a particular felony murder. . . . [U]nder that provision, murder in the perpetration of aggravated child abuse is a separate offense from murder in the perpetration of aggravated child

---

[13](...continued)
Statement of Rep. Hood, House Session, Mar. 9, 1998. The bill, as amended, passed 97-0.

Senator Joe Haynes introduced Senate Bill 2932 in the Senate Judiciary Committee on March 31, 1998, and the same amendment adopted by the House was approved by the committee. There was no discussion of the bill in committee, other than to note that it passed the House 97-0. When the bill reached the floor of the Senate, Senator Haynes withdrew the amendment because it was in the House bill, which already had been substituted for the Senate bill. He described the bill just as Representative Hood had on the House floor a few weeks earlier. Statement of Sen. Haynes, Senate Session, Apr. 6, 1998. The bill passed the Senate 30-0.

On April 16, 1998, the sponsors successfully recalled the bill from the Governor's desk in order to fix a typographical error in the reference to the Tennessee Code Annotated. On April 23, 1998, the Senate corrected the bill and returned it to the House by a vote of 32-0. Five days later, the amended version of HB 3154 reached the House floor. Representative Hood stated that the bill "made more specific the language separating the two offenses of aggravated child abuse and aggravated child neglect." Statement of Rep. Hood, House Session, Apr. 28, 1998. The amended bill passed the House 92-0.

The statute has been further amended since 1998. The current version continues to list aggravated child abuse and aggravated child neglect separately: "First degree murder is: . . . (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy[.]" Tenn. Code Ann. § 39-13-202(a) (2010).

neglect, no different than murder during the perpetration of air piracy, for example. . . . I believe that under the statute, charging murder in the perpetration of aggravated child abuse did not charge murder in the perpetration of aggravated child neglect.

Dorantes, 2009 WL 4250431, at *17 (Tipton, P.J., dissenting). We agree with his assessment. Plainly, our General Assembly chose to provide two separate and distinct courses of conduct, aggravated child abuse and aggravated child neglect, upon which a felony murder may be predicated.

## Analysis
### 1. Sufficiency of the Evidence

Because one may assume the responsibilities of a parent under the doctrine of in loco parentis, the defendant's failure to seek medical assistance for the victim's injuries may have supported convictions for aggravated child neglect and felony murder by aggravated child neglect. See State v. Sherman, 266 S.W.3d 395, 406 (Tenn. 2008). As we have observed, however, the State was precluded from charging the defendant with those particular crimes by the terms of the extradition agreement and the doctrine of specialty. Indeed, as the defendant argues, the trial court did not instruct the jury as to aggravated child neglect and, therefore, a felony murder conviction for "aggravated child abuse by neglect" would not have been proper.[14] See T.P.I. – Crim. 21.01(a) (for offenses committed prior to July 1, 2005); see also Dorantes, 2009 WL 4250431, at *17 (Tipton, P.J., dissenting).

The defendant's argument, however, relies on the premise that the evidence was insufficient to support convictions based upon the crime of aggravated child abuse. As the State set forth in its response to the defendant:

> The State has never argued and does not now argue that the defendant is guilty of aggravated child abuse by neglect. Rather, the State's argument is that the proof shows that the defendant knowingly treated the child in such a manner as to inflict injury, either as principal or as one criminally responsible for the conduct of another. The State takes the position that . . . the evidence, in this instance, is sufficient to establish that the defendant either committed the offenses or is criminally responsible for Patlan's commission of the offenses.

---

[14] In the instructions to the jury, the trial court defined "aggravated child abuse" as requiring that the defendant: (1) "knowingly, other than by accidental means, treat[ed] a child in such a manner as to inflict injury; and (2) that the act of abuse resulted in serious bodily injury to the child; and (3) that the child was six (6) years of age or less."

-16-

Thus, even though we disagree with the majority of the Court of Criminal Appeals that evidence of aggravated child neglect may support a conviction for the offense of felony murder in the perpetration of or attempt to perpetrate aggravated child abuse, the critical question before us is whether the circumstantial evidence, when considered as equal in stature with direct evidence, is sufficient to have persuaded a rational jury, by the proper "use [of] its experience with people and events in weighing the probabilities," of the defendant's guilt beyond a reasonable doubt of aggravated child abuse and felony murder by aggravated child abuse. Holland, 348 U.S. at 140. Criminal responsibility for the conduct of another, while not a separate crime, may serve as a basis for conviction – working "in synergy with the charged offense." Sherman, 266 S.W.3d at 408.

As stated, at the time of the victim's death, the statute for aggravated child abuse and neglect provided that "[a] person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and . . . [t]he act of abuse or neglect results in serious bodily injury to the child[.]" Tenn. Code Ann. § 39-15-402(a) (Supp. 2002). Moreover, "if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony." Tenn. Code Ann. § 39-15-402(b).[15] First degree felony murder may be committed by the killing of another in the perpetration of or the attempt to perpetrate aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2002).

The mental state required for the offense of child abuse and neglect is "knowingly, other than by accidental means." Tenn. Code Ann. § 39-15-401(a) (Supp. 2002). The term "knowing," as it appears in our statutory scheme, refers to one of four culpable mental states – mens rea – adopted by the General Assembly for use throughout the state's criminal code. See Tenn. Code Ann. § 39-11-302 (1997); Hanson, 279 S.W.3d at 276; State v. Page, 81 S.W.3d 781, 786 (Tenn. Crim. App. 2002) ("There are four culpable mental states in Tennessee: intentional, knowing, reckless and criminal negligence."). "Knowing" is defined as follows:

---

[15] We have held that the offense of child abuse and neglect described in Tennessee Code Annotated section 39-15-401 is a single offense that may be committed through one of two courses of conduct. Mateyko, 53 S.W.3d at 668-69, n.1. As we have observed, however, the 1998 amendment replaced the language of Tennessee Code Annotated section 39-15-402 in its entirety, with the purpose of establishing aggravated child abuse and aggravated child neglect as separate offenses. Compare Tenn. Code Ann. § 39-15-402(a) (1997) (referring to "the offense of aggravated child abuse and neglect") with Tenn. Code Ann. § 39-15-402(a) (Supp. 2002) (referring to "the offense of aggravated child abuse or aggravated child neglect"). The revisions are not in tension with the Mateyko ruling because they address different statutes, and because of the requirement that the State provide, at the defendant's request, details of the charges necessary to the preparation of the defense. See State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991).

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b). This definition contemplates that the term "knowing" may be applied to the following: (1) the nature of the defendant's conduct, (2) the circumstances surrounding the defendant's conduct, and (3) the result of the defendant's conduct. Hanson, 279 S.W.3d at 276. A nature-of-conduct offense "seeks principally to proscribe the nature of the defendant's conduct, as opposed to the result that the defendant's conduct achieves." Mateyko, 53 S.W.3d at 673. In contrast, the mental state required for a result-of-conduct offense accompanies only its resulting harm. Hanson, 279 S.W.3d at 276. Aggravated child abuse is classified as a nature-of-conduct offense. Id. at 276-77 (quoting State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000)). As a nature-of-conduct offense, the evidence must be sufficient for a rational jury to have concluded, beyond a reasonable doubt, that the defendant was aware of the nature of his conduct when he treated the victim in such a manner as to inflict injury, and that, in so doing, he acted other than by accidental means. Hanson, 279 S.W.3d at 277.

Further, our statute provides that one "is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (1997). "Each party to an offense may be charged with commission of the offense." Tenn. Code Ann. § 39-11-401(b). Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another. State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). A person may be criminally responsible for an offense committed by the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (1997).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." State v. Phillips, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). Further, no specific act or deed need be demonstrated. State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. State v. Maxey, 898 S.W.2d

756, 757 (Tenn. Crim. App. 1994); State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). The legislative intent behind the criminal responsibility statutes was clearly to "embrace the common law principles governing aiders and abettors and accessories before the fact." State v. Carson, 950 S.W.2d 951, 955 (Tenn. 1997).

Viewed in the light most favorable to the State, the proof at trial established that the defendant participated in the abduction of the victim on June 18, 2002, and that he shared physical custody with Patlan until the death of the victim, who was then four years of age. During this time, the defendant had an itinerant existence and typically had control of the van, which, by all indications, also served as a place of habitation. When Patlan demonstrated some concern for the victim just prior to his death by asking her sisters for money to buy medicine in order to treat his injuries, the defendant demonstrated no desire to help and was evasive when questions arose about the nature of the victim's condition. For example, when Antonia asked Patlan what had happened to the victim, the defendant interrupted the conversation, directing Patlan to leave before she had the opportunity to explain. Further, Patlan later sought help from her sister Maria, expressing her fear that the victim might die; Maria, after seeing the condition of the victim, confronted the defendant directly, asking why the boy had not been taken to a doctor. In response, the defendant expressed a disregard for the victim's welfare, explaining that he never wanted to take custody of the victim, and angrily blamed Patlan for undertaking the obligation while referring to her in derogatory terms. The defendant hurriedly drove away after Maria's inquiries, avoiding further explanation. Moreover, a diaper and clothing hid the burns to the victim's buttocks and rear upper thighs. Wrapped elastic bandages around the feet were covered by socks. From all of this, a jury could have reasonably inferred that the defendant was not willing to allow others to either observe the seriousness of the victim's injuries or ascertain his need for intensive medical treatment.

The victim was normal and healthy at the time of his abduction. When last seen by Antonia and Maria, he was in a van driven by the defendant, and was thin, unable to communicate, and obviously suffering from illness and injury. Shortly thereafter, the victim's body, horribly burned on the feet, the buttocks, and the upper thighs, was found in West Park, obviously abandoned there. The body had been discarded behind a mound, which obscured its view from the parking area. The evidence suggests that the victim's clothes had not been changed from the time he was seen by Maria until his death some three days later. In the meantime, the defendant and Patlan had fled the jurisdiction.

The autopsy established that the major injuries were second and third degree burns, sustained as the result of being placed in scalding hot water, and a fractured skull from blunt force trauma. The pattern of the burns, suffered by the victim within two weeks of his death, indicated that he had been immersed in scalding water, buttocks and feet first, in a fetal-like

position. Dr. McMaster, who conducted the autopsy, was resolute in her conclusion that the burns could not have been accidental. While her autopsy established the immediate cause of death as a blunt trauma injury to the brain and skull, the infections from the burns, in her opinion, would have inevitably been fatal absent medical treatment. Dr. McMaster also determined that the blow to the victim's head could not have been accidental. There was a wound to the right hand of the victim that was consistent with an effort by the victim to protect himself from attack. There were dozens of other injuries, some recent and some older, which were inflicted over a period of time and which were in various stages of healing. Photographs of the body were not only gruesome, but also particularly probative of aggravated child abuse. According to an administrator with the Department of Children's Services, the victim's injuries were so severe that any medical worker, had treatment been sought, would have reported the injuries to authorities. The defendant not only fled the state but hid out after the death of the victim, avoiding arrest for over three years until found and extradited from Mexico.

The circumstantial evidence presented to the jury, in our view, led to the reasonable inference that the defendant either knowingly, other than by accidental means, committed aggravated child abuse as the primary actor or, at a minimum, intentionally solicited, directed, aided, or attempted to aid Patlan in the commission of the offenses. See Tenn. Code Ann. § 39-11-402(2). As stated, physical participation in the crime is not an essential element under the criminal responsibility theory; encouragement of the crime is enough.

Moreover, "flight and attempts to evade arrest are relevant as circumstances from which, when considered with other facts and circumstances in evidence, a jury can properly draw an inference of guilt." State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985). After the body of the victim, last seen alive in a van driven by the defendant, was disposed of in West Park, the defendant and Patlan fled to Mexico, and neither could be found, even with prominent mention of the crime on the "America's Most Wanted" television show. This is especially probative of guilt. Prior to jury deliberations, the trial court properly instructed the jury as to how to interpret flight from prosecution:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may

-20-

be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

See T.P.I. - Crim. 42.18 (10th ed. 2006); see also State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996). Any inference of guilt by virtue of the defendant's departure from this jurisdiction was clearly warranted.[16]

---

[16] The Court of Criminal Appeals has quoted American Jurisprudence 2d on the issue of flight:

> The fact that a defendant after the commission of a crime concealed himself or fled from the vicinity where the crime was committed, with knowledge that he was likely to be arrested for the crime or charged with its commission, may be shown as a circumstance tending to indicate guilt.

Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979) (quoting 29 Am. Jur.[2d] Evidence § 280).

Earlier, in Rogers v. State, 455 S.W.2d 182 (Tenn. Crim. App. 1970), our intermediate court adopted the view set out in Corpus Juris Secundum on the subject:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

Id. at 187 (quoting 22A C.J.S. Criminal Law § 625); see also State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986).

"A minority of the states have either done away with or limited the instances in which the jury is

(continued...)

Because the evidence is not conclusive as to whether the defendant or Patlan inflicted the injuries that led to the victim's death, the defendant cites State v. Hix, 696 S.W.2d 22 (Tenn. Crim. App. 1984), overruled on other grounds by State v. Messamore, 937 S.W.2d 916, 919 n.3 (Tenn. 1996), as authority that one parent cannot be convicted of child abuse on the basis that he or she is one of two possible custodians responsible for the death. In Hix, a husband and wife were convicted of abuse and battery and child abuse against their six-week old child, who had a fractured thigh and broken ribs. 696 S.W.2d at 24. Because the evidence did not prove beyond a reasonable doubt which parent committed the crimes, the Court of Criminal Appeals found the evidence insufficient to support the convictions. Id. at 24-25. As argued by the State, however, the case before us is readily distinguishable from Hix. Because the offenses in Hix occurred prior to the 1989 Sentencing Reform Act, resolution of the appeal in that case did not involve consideration of criminal responsibility for the conduct of another, as set forth in Tennessee Code Annotated sections 39-11-401 and -402. Cf. Lemacks, 996 S.W.2d at 171 (sustaining a conviction under a theory of criminal responsibility when the jury was instructed that the defendant could be found guilty of driving under the influence if he was found to either have been the driver or have allowed another who was under the influence to operate the vehicle).

Further, our Court of Criminal Appeals has more recently considered similar circumstances under the version of the statute applicable to the defendant. In State v. Nunn, No. E2007-02333-CCA-R3-CD, 2009 WL 4790211 (Tenn. Crim. App. Dec. 14, 2009), perm. app. denied (Tenn. 2010), the defendants, parents of a nine-month-old child, were the sole custodians during a period in which the child suffered severe internal injuries and fractures to his skull, arm, and leg. The parents were both convicted of aggravated child abuse under a theory of criminal responsibility, absent any direct evidence that the two inflicted the injuries. Id. at *21-22. Our intermediate court properly held that the jury was under no obligation "to determine unanimously whether a defendant is either directly liable or

[16](...continued)
charged on the law of flight." State v. Kyger, 787 S.W.2d 13, 28 (Tenn. Crim. App. 1989). For example, in State v. Humbolt, 562 P.2d 123, 127 (Kan. Ct. App. 1977), the Court of Appeals of Kansas held that "[t]he weight to be given any evidence [of flight] is a matter for counsel to argue and for the jury to determine." See also People v. Larson, 572 P.2d 815, 817-18 (Colo. 1977) (holding that an instruction on flight "should be sparingly given" "because it gives undue influence to one item of evidence"); State v. Wrenn, 584 P.2d 1231, 1233 (Idaho 1978) ("[B]ecause of the debatable significance of flight as evidence of guilt, an instruction on flight should not ordinarily be given. It should be left to argument to the jury by the parties, unless the trial judge because of the peculiar facts in the particular case feels it is essential to the jury's deliberations."); State v. McCormick, 571 P.2d 499, 501 (Or. 1977) ("[T]he debatable significance of flight can in most cases be left to argument by the parties . . . ."). Tennessee subscribes to the majority view among the states, which is to charge the jury regarding flight where appropriate. Kyger, 787 S.W.2d at 29.

criminally responsible for the harm inflicted." Id. at *25. As in Nunn, and unlike in Hix, the jury in this case was instructed on a theory of criminal responsibility.

In summary, the evidence, even though entirely circumstantial, is sufficient to support the jury's finding of guilt beyond a reasonable doubt of each of the offenses charged. The autopsy report, photographs of the injuries, and the defendant's flight from this jurisdiction and hiding out for three years were especially probative. The jury had a rational basis for the verdicts of guilt as to each count.

### 2. Request for Special Jury Instruction
During the course of the trial, the defendant proposed a special request for the trial court to supplement the jury instructions as follows:

> For you to find the accused guilty of aggravated child abuse the State must prove that the Defendant affirmatively committed an abusive action which resulted in serious bodily injury to the victim. Failure by either defendant to protect or seek treatment is not proof of abuse as to satisfy the elements of child abuse.

The trial court denied the request, holding that the statutory language on child abuse and neglect and aggravated child abuse sufficiently explained that the State was required to prove, beyond a reasonable doubt, that the defendant "knowingly, other than by accidental means, treat[ed] a child under [six] years of age in such a manner as to inflict injury," and that such action resulted in serious bodily injury to the child. See Tenn. Code Ann. §§ 39-15-401 & -402. The defendant contends that he is entitled to a new trial because the instruction would have clarified the obligation of the State to prove aggravated child abuse through infliction of injury rather than aggravated child abuse through neglect. In response, the State submits that the instruction sought by the defendant regarding "[f]ailure . . . to protect or seek treatment" was far too broad and, for example, could have been interpreted to preclude a conviction for a defendant who actively prevented medical treatment for a severely injured victim. The State further argues that the jury charge was adequate to protect the defendant from a conviction based upon "mere neglect."

It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005); State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001); State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). "It is the duty of the trial judge without request to give the jury proper instructions as to the law governing the issues raised by the nature of the proceedings and the evidence introduced during trial . . . ." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). The purpose

"of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). The refusal to grant a special request for an instruction is error only when the general charge fails to fully and fairly provide the applicable law, considering the instructions in their entirety and reading them as a whole rather than in isolation. Hanson, 279 S.W.3d at 280.

The trial court, which concluded that the pattern instruction on aggravated child abuse adequately informed the jury of the State's obligation to prove the knowing infliction of an injury and resulting bodily injury, provided the following instruction on aggravated child abuse:

> For you to find the defendant guilty . . . the state must have proven beyond a
> reasonable doubt the existence of the following essential elements:
> (1) that the defendant did knowingly, other than by accidental means, treat a
> child in such a manner as to inflict injury;
> (2) that the act of abuse resulted in serious bodily injury to the child; and
> (3) that the child was six (6) years of age or less.

In our view, the trial court's charge was adequate.[17] "Knowingly" and "other than by accidental means" inflicting injury on a child less than six qualifies as terminology which can be readily understood. The trial court's refusal to supplement the pattern instruction did not constitute reversible error.

### 3. Sentencing

The trial court imposed a mandatory sentence of life imprisonment for felony murder and a sentence of twenty-two years for the aggravated child abuse conviction. The sentences were ordered to be served consecutively. As we have observed, aggravated child abuse is a Class A felony when the child is less than 6 years old. Tenn. Code Ann. § 39-15-402(b). As a Range I offender, the defendant is subject to a sentence of between 15 and 25 years. Tenn. Code Ann. § 40-35-112(a)(1) (1997). The presumptive sentence for a Class A felony, at the time of offense, is the midpoint of the range. See Tenn. Code Ann. § 40-35-210(c) (1997 & Supp. 2002). The trial court found four enhancement factors: (1) the defendant had prior misdemeanor convictions; (2) the defendant treated or allowed the victim to be treated

---

[17] In Nunn, our Court of Criminal Appeals determined that "[a] rational jury could find beyond a reasonable doubt that . . . one or both [parents] inflicted the injuries," and, if not, that each parent "was criminally responsible because he or she failed to make a reasonable effort to prevent the beating." 2009 WL 4790211, at *24.

with exceptional cruelty; (3) the personal injuries inflicted on the victim were particularly great; and (4) the defendant abused a position of private trust. See Tenn. Code Ann. § 40-35-114(2), (6), (7), (16) (Supp. 2002). The trial court found no mitigating factors.

In State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007), this Court held that an imposition of a greater sentence based upon factual determinations made by the trial judge rather than a jury violates the Sixth Amendment. See Cunningham v. California, 549 U.S. 270, 290 (2007); Blakely v. Washington, 542 U.S. 296, 305 (2004). Based upon our holding in Gomez, three of the enhancement factors cannot apply. Prior criminal history, however, is an enhancement factor that does not offend the Sixth Amendment absent submission of the issue to a jury. Gomez, 239 S.W.3d at 740; Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). Because the defendant had three prior misdemeanor convictions, two for theft and one for assault, it is our view that a two-year enhancement above the midpoint of the range for the aggravated child abuse conviction is warranted. The length of the sentence for the aggravated child abuse conviction is, therefore, affirmed.

Further, the trial court ordered the sentences to be served consecutively on the basis that the defendant qualified as a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(4) (1997) (describing a "dangerous offender" as one "whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high"). The trial court specifically found that the aggregate term of confinement was reasonably related to the severity of the offenses and was necessary to protect society from the defendant's criminal behavior. See State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). While the Criminal Sentencing Reform Act of 1989 requires a principled justification for every sentence, including, of course, consecutive sentences, sentencing is a human process that is not subject to a set of mechanical rules. Id. at 938. Whether sentences are to be served concurrently or consecutively is primarily within the discretion of the trial court. See State v. Hastings, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999); see also Tenn. Code Ann. § 40-35-115(b) (providing that "[t]he [trial] court may order sentences to run consecutively if the court finds by a preponderance of the evidence that" one or more of the statutory criteria exist) (emphasis added). Because the defendant, at a minimum, demonstrated extreme callousness toward the health and welfare of the victim, and the results were fatal, the trial court, in our view, had a reasonable basis for imposing consecutive sentences.

**Conclusion**

The judgment of the Court of Criminal Appeals is reversed in part and affirmed in part, and the sentences imposed by the trial court for each of the two offenses are reinstated. It appearing that the defendant is indigent, costs of this appeal shall be taxed to the State of Tennessee.

_____
GARY R. WADE, JUSTICE