# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 19, 2012

## STATE OF TENNESSEE v. DESHAWN LAMAR BAKER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-B-1373     Mark J. Fishburn, Judge**

---

**No. M2011-00946-CCA-R3-CD - Filed March 28, 2013**

---

A Davidson County Grand Jury returned an indictment against Defendant, DeShawn Lamar Baker, charging him with solicitation of aggravated robbery, conspiracy to commit aggravated robbery, aggravated robbery, and felony possession of a handgun.  Following a jury trial, Defendant was convicted of conspiracy to commit aggravated robbery, aggravated robbery, and felony possession of a handgun.  Defendant was sentenced to ten years for the conspiracy charge, eighteen years for aggravated robbery, and four years for the handgun charge to be served concurrently for an effective eighteen-year sentence in the Department of Correction as a Range II offender.  On appeal, Defendant argues: (1) that the evidence was insufficient to support his convictions; and (2) that the State commited prosecutorial misconduct by failing to timely disclose the discovery of his wallet containing the victim's driver's license and that John Peoples would be called as a witness at trial.  After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M TIPTON, P.J. and JOHN EVERETT WILLIAMS, J., joined.

Michael A. Colavecchio, Nashville, Tennessee, (on appeal); and Paul Walwyn, Nashville, Tennessee, (at trial), for the appellant, DeShawn Lamar Baker.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Bret Gunn, Assistant District Attorney General; and Rob McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Background

*Trial Testimony*

At approximately 1:30 p.m. on July 22, 2008, the victim, Andrew Osborne, stopped at Jimmy's Bi-Rite located at the intersection of Douglas Avenue and Lischey Avenue in Nashville. He was in the store for approximately ten minutes and left. As he was walking to his car, two African-American males, later identified as John Peoples and Bobby Peebles, a juvenile, were walking toward him in the parking lot. As the victim opened his car door and sat down, John Peoples pulled a gun out of his waistband, pointed it at the victim's head and chest, and said, "Let's go, come up off your shit, give me your stuff." The victim then emptied his pockets onto the parking lot, which included his keys, wallet, cell phone, and some coins. Both men grabbed the items from the ground, except for the victim's cell phone that had rolled under the victim's car. The victim testified that Mr. Peoples began patting him down, but he and Mr. Peebles ran away when a van pulled up next to them. The victim then retrieved his phone from under the car, ran inside the store and told the clerk that he had been robbed, and he dialed 9-1-1.

The victim testified that he had briefly noticed the two men in the store earlier, along with a third male, later identified as Defendant. He said that Defendant was wearing a green hat and a white shirt and had been "eyeing" him while he was "making a transaction" in the store. The victim further described Defendant's actions as "[s]ort of just walking past me and like looking over, looking at me." He said that Defendant, Mr. Peoples, and Mr. Peebles were standing to his right when he walked out of the store. The victim further testified that when he walked out of the store, Defendant "was in the direction, off in the same direction as the other two that actually approached me, I want to say he was a little bit farther in the end of the building."

The victim testified that police arrived within five minutes, and he gave them a description of Defendant "because that's who [he] first remembered vividly as being in the store, . . ." The victim later identified Defendant, Mr. Peoples, and Mr. Peebles. At trial, he identified himself and Defendant on the surveillance video from the store. The victim testified that his wallet was returned to him later, on the afternoon of the robbery, but it was empty. He said, "Somebody down the street said they had seen it or somebody found it and had thrown it back there. I didn't - I didn't have my license or my social or any of that stuff in it." The victim testified that he received his driver's license back "months after the robbery." He was informed that it was found in Defendant's wallet.

Lena Boleyjack testified that on July 22, 2008, she was living at 1018 Pinok Avenue with her son and five daughters. On that day, Defendant stopped by her house along with John Peoples and Bobby Peebles. Ms. Boleyjack testified that that Mr. Peoples and Mr. Peebles left, but Defendant was sitting on her porch when "police cars started coming around." Defendant then said, "I'm not studin' them" meaning that he did not care about the police. Ms. Boleyjack testified that she told Defendant three times not to go inside her house, but he ran inside when police surrounded the house. She told police officers to catch Defendant coming out the back door. Ms. Boleyjack testified that she told police that her three oldest daughters were still inside the house. Because she thought Defendant ran out the back door, she went inside the house to get her daughters. She then learned that Defendant had run upstairs to her daughter's room. To her knowledge, Defendant, Mr. Peoples, or Mr. Peebles had not been upstairs prior to the police arriving. Ms. Boleyjack testified that police got on the loudspeaker and ordered Defendant out of the house three or four times, and he finally walked out and was taken into custody. She said that Defendant was wearing a green hat. Ms. Boleyjack was aware that police found a gun in her seventeen-year-old daughter's bedroom. To her knowledge, no one in her house had a gun. Ms. Boleyjack told police where they might be able to locate Mr. Peoples and Mr. Peebles.

Ms. Boleyjack testified that approximately three months later, her daughter, Sharon Campbell, gave her a wallet containing Defendant's driver's license and social security card, and it also contained the victim's driver's license and a bank or credit card. It was found in a bedroom of her house, but not the same bedroom where the gun had previously been found. She called detectives and notified them of the wallet, and they picked it up the following morning.

On cross-examination, Ms. Boleyjack testified that Defendant dated her husband's niece and that he had been to her house on previous occasions. She explained that Mr. Peoples and Mr. Peebles attended school with her daughter, and they had also been to her house on previous occasions. Ms. Boleyjack testified that July 22, 2008, was significant to her because it was her eldest daughter's birthday. Two of Ms. Boleyjack's daughters told her that Mr. Peoples and Mr. Peebles "stepped in the front door and told my daughter happy birthday and went out." Ms. Boleyjack testified that she told one of her daughters that she did not want the two men in her house because she did not want her children involved in any of their activities.

Sharon Campbell, Ms. Boleyjack's daughter, testified that she was at home when Defendant, Mr. Peoples, and Mr. Peebles showed up on July 22, 2008. She said that Mr. Peoples and Mr. Peebles walked inside the house first and went into the second bedroom on the first floor to tell her oldest sister happy birthday. Ms. Campbell testified that Defendant later walked into the house and told her sister happy birthday, and he left. She said that when

police arrived, she stepped out of the bathroom and heard Ms. Boleyjack say, "Don't go in my house." Ms. Campbell testified that Defendant then ran past her and "through the living room into the den and to the upstairs because the upstairs is going into the den." She explained that her bedroom was located upstairs, along with her sister, Laura Campbell's bedroom. Ms. Campbell said that she did not see Mr. Peoples or Mr. Peebles go upstairs.

Ms. Campbell testified that approximately three months later, she was cleaning under her "shifferobe" and found a billfold under it. She then took the item to her mother, who opened it and called a detective.

Laura Campbell testified that she was at home on July 22, 2008, when police arrived and arrested Defendant. She later learned that police recovered a gun from her bedroom. Ms. Campbell testified that the gun did not belong to her, and she was not aware that it was in her room. She saw Mr. Peoples and Mr. Peebles go into her sister's room and tell her happy birthday, and they left. Ms. Campbell did not see anyone go upstairs because she was in her mother's bedroom using the telephone.

Officer Mike Abbott of the Metropolitan Nashville Police Department testified that he responded to the robbery at Jimmy's Bi-Rite on July 22, 2008. He spoke with the victim, who gave him information about the suspects. Officer Abbott then went into the store and viewed the surveillance tape of the time period that the victim was inside. He later radioed the other officers to be on the look-out for at least two suspects. The description included a suspect wearing a white T-shirt and green ball cap.

Officer Misty Hobbs also responded to the area in which the robbery occurred. She ultimately drove to a residence on Pinok Avenue located approximately two and a half to three blocks from Jimmy's Bi-Rite because another officer believed he saw the three suspects involved in the robbery at the residence. Officer Hobbs and three other officers arrived at the residence and saw Defendant standing on the front porch wearing a white T-shirt and a green hat. When Defendant saw the officers pull up, Officer Hobbs testified that "he turned around like he was going to casually walk back in the house, and as soon as we got out of the car and we yelled 'stop,' he bolted in the house, so we immediately surrounded the house to be sure he didn't run out the back door." Officer Hobbs spoke to a resident at the house who told her Defendant's name. She then "got on [her] PA system in [her] car, gave [Defendant] verbal commands, told him to come out of [the] house with his hands up, do not resist." Officer Hobbs repeated the command three times, and Defendant finally walked out and surrendered himself. Defendant was taken into custody, and the officers "cleared" the house. Sergeant Lawrence Hansen located a handgun in an upstairs bedroom under a mattress.

It was later determined that John Peoples and Bobby Peebles had been with Defendant. Officer Hobbs drove approximately six blocks to 209 Cleveland Street where the two men were located. Officer Hobbs testified that she had previously dealt with Mr. Peoples and Mr. Peebles.

Detective William Stewart was dispatched to the robbery. He first drove to Jimmy's Bi-Rite, spoke with the victim and the on-scene officer, and he viewed the surveillance video from inside the store. Detective Stewart then drove the victim to the address on Pinok Avenue. The victim identified Defendant as one of the individuals who robbed him. Detective Stewart viewed the green cap and the handgun found in the residence. Detective Stewart then drove to the address on Cleveland Street. The victim identified John Peoples and Bobby Peebles as also being involved in the robbery.

Detective Stewart testified that as he was transporting the victim back to Jimmy's Bi-Rite, the victim said that an acquaintance told him that he had found the victim's wallet and placed it next to a trash container near the store. When the victim and Detective Stewart arrived back at the store, they observed the trash container, and the victim retrieved his wallet. However, the contents were missing.

Detective Stewart later conducted a recorded interview with Defendant. Defendant admitted that he was in the store with Mr. Peoples and Mr. Peebles, but he denied being involved in the robbery. Defendant told Detective Stewart that he left the store and later met up with the two men and suspected that they had done something. He said that he saw John Peoples with a wallet and a gun in his front pocket. He also saw Bobby Peebles with a set of keys. He denied hiding the gun upstairs at Ms. Boleyjack's house. Detective Stewart testified that he received a phone call from Sharon Campbell or Ms. Boleyjack on October 14, 2008, indicating that Ms. Campbell was cleaning under her bed and found a brown wallet. The wallet contained Defendant's identification, Social Security card, bank cards, and the victim's driver's license. Detective Stewart drove to Ms. Boleyjack's house and retrieved the items. He later returned the victim's driver's license to him.

John Peoples testified that he pled guilty to aggravated robbery arising out of the incident at Jimmy's Bi-Rite on July 22, 2008. When asked at Defendant's trial about the circumstances of the robbery, Mr. Peoples said:

Me and [Defendant] and my cousin [Bobby Peebles] walked into the store, and [Defendant] and [Bobby Peebles] had walked into the store, and I was outside the store, and the guy that was outside the store wanted to buy some pills and I was out there talking to him, and he was like "Do you got any pills," I was like, "No, but wait until my cousin come out and I'll ask him." And they came

out the store and I asked them do they got some pills or whatever, they was like, no, they don't have no pills, so I got his number, and I was talking to Bobby or whatever and he was like, "Guy in there got some cash" or whatever, so I had got the gun from [Defendant] and robbed the guy and me and [Bobby Peebles] had fled and ran, and like 30 minutes later they came and picked us up at my granny's house.

Mr. Peoples testified that he told Detective Stewart that Defendant first attempted to get Mr. Peebles to commit the robbery, but Mr. Peoples then said that he would commit the offense, and he took the gun from Defendant. However, Mr. Peoples claimed that he "made up" the statement to Detective Stewart because he was afraid that he would be "locked up." Mr. Peoples testified that Defendant had the gun, and he did not discuss the robbery with Mr. Peebles. He said that he also agreed to that statement in the facts at the guilty plea hearing because he was scared that he would receive more jail time for lying.

Mr. Peoples testified that he left his gun at his grandmother's house, and someone came and picked it up. However, he agreed that he told Detective Stewart that he gave the gun to Defendant. He also agreed that the statement was true at the guilty plea submission hearing. Mr. Peoples claimed that he did not know what happened to the contents of the victim's wallet because Mr. Peebles had picked it up. He testified that he met up with Defendant and Mr. Peebles after the robbery at the house on Pinok Avenue to wish a girl named "Shay" happy birthday. Mr. Peoples testified that he had been at the house on a couple of previous occasions and had been upstairs.

*Motion for New Trial*

At the hearing on Defendant's motion for new trial, the following exchange took place between John Peoples and Defendant's trial counsel:

| [Defendant's counsel]: | Okay, so you weren't actually tried at the same time, you testified at the trial? |
|---|---|
| [John Peoples]: | Yes, sir. |
| [Defendant's counsel]: | Okay. And were you represented by an attorney at that time? |
| [John Peoples]: | Yes. |

| [Defendant's counsel]: | All right. Now, after you testified at [Defendant's] trial, did you eventually enter a guilty plea in this case? |
|---|---|
| [John Peoples]: | Yes. |
| [Defendant's counsel]: | And what was the amount of - what kind of sentence did you receive? |
| [John Peoples]: | Eight years at thirty percent. |
| [Defendant's counsel]: | Now, eight years at thirty percent, now that's - what you were accused of, you were looking at a lot more time than that, weren't you? |
| [John Peoples]: | Yes. |

Mr. Peoples testified that he completed an affidavit on May 19, 2010, several months after Defendant's trial, "basically saying that the DA told me that I was facing twenty or thirty years, or I can say what he wanted me to say and they would give me eight years at thirty percent with a recommendation of parole." Mr. Peoples testified that Defendant did not coerce him into "making out" the affidavit.

Mr. Peoples claimed that his testimony at trial indicating that Defendant handed a gun to him during the commission of the robbery was false. He said that he was not truthful "[b]ecause I felt like I was going to do more time if I didn't say what he told me to say." Defendant testified that before his testimony at Defendant's trial, the "DA" sat down with him in one of the holding cells and told him what to say. He said that his attorney was not present when he spoke with the prosecutor. Defendant testified that prior to his testimony at Defendant's trial, he had been advised that Defendant told police that Mr. Peoples had committed the robbery and that Defendant was going to testify against him. He said that he lied on the witness stand because he was given an opportunity to testify against Defendant in order to receive a better deal.

On cross-examination, Mr. Peoples admitted that he pled guilty to the robbery "months" before Defendant's trial, on February19, 2009. He was asked about the plea at Defendant's trial. Defendant agreed that he was asked by the trial court at his guilty plea hearing whether he had been promised, coerced, or threatened in any way, and he said "no." However, he claimed that he was lying to the judge. The following exchange then took place between the prosecutor and Mr. Peoples:

| [Prosecutor]: | Okay. And - but you said that you were - you were threatened with more time if you didn't testify, right? Is that what you're saying? |
| [Defendant]: | Yes, sir. |
| [Prosecutor]: | Well, how could you have gotten more time when your case was already done with us? |
| [Defendant]: | Because they told me if, uh, if I didn't say what they told me to say they were going to take me to the judge and tell him to give me some more time. |
| [Prosecutor]: | Even though you had already pled guilty, your case - you had been - the case was al - the guilty plea was five or six months old and you were already doing your time? |
| [Defendant]: | Yeah. |

Mr. Peoples testified that Defendant was not present when he and Mr. Peebles robbed the victim.

Assistant Attorney General Bret Gunn testified that he was assigned to prosecute Defendant's case. Prior to Defendant's trial, he had prosecuted John Peoples. He did not recall "any direct contact with Mr. Peoples, other than negotiating with Mr. Mayes about the disposition that he took. I can only recall discussing the possibility that he might have to testify in the future." Mr. Gunn testified that Mr. Peoples' testimony against Defendant was not part of his plea agreement. He said,

I don't think it was discussed. I mean I - I might have had it in my mind and that's why I went through a fairly detailed reading of the facts and made sure that he said that those facts were true, but it was not part of the negotiations of the deal.

Mr. Gunn testified that he did not have any contact with Mr. Peoples between the time of Mr. Peoples' plea agreement in February of 2009 and Defendant's trial in August of 2009. He never spoke with Mr. Peoples alone.

Mr. Gunn testified that when Mr. Peoples was brought out for Defendant's trial, he acted confused and began lying about the incident when questioned by Mr. Gunn. The trial court then appointed Mr. Peoples an attorney to discuss the possibility of perjury prior to Mr. Peoples continuing his testimony. After Mr. Peoples spoke to the attorney, he resumed his testimony and described Defendant's role in the robbery. His testimony was somewhat similar to the facts that he had agreed to at his guilty plea submission hearing. Mr. Gunn testified that after Defendant entered his guilty plea, it would not have been possible for any member of the District Attorney General's office to change the agreement.

## II. Analysis

### I.        Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence for his convictions of conspiracy to commit aggravated robbery, aggravated robbery, and felony possession of a handgun. He argues that he was not present and did not participate in the robbery and that he never possessed the weapon or hid it in the house. He also contends that the accomplice testimony of John Peoples was not sufficiently corroborated.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

It is well-settled that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). Regarding the rule of corroboration, our Supreme Court has stated:

The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

*Sherrill v. State,* 204 Tenn. 427, 321 S.W.2d 811, 815 (1959). "In short, the evidence must confirm in some manner that (a) a crime has been committed and (b) the accused committed the crime." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). However, Tennessee requires only a modicum of evidence in order to sufficiently corroborate such testimony. *State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984).

To support Defendant's conviction for aggravated robbery, the State was required to prove that Defendant committed the intentional or knowing theft of property from the person of another using violence or fear and accomplished with a deadly weapon or an article used to lead a victim to reasonably believe it to be a deadly weapon. *See* Tenn.Code Ann. §§ 39-13-401(a),-402(a). As for conspiracy to commit aggravated robbery, Tennessee Code Annotated section 39-12-103(a) defines conspiracy: The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense. In order to be convicted of felony possession of a handgun, the State was required to prove beyond a reasonable doubt that Defendant possessed a handgun after being convicted of a felony.

Viewing the evidence in a light most favorable to the State, the proof showed that the victim stopped by Jimmy's Bi-Rite on July 22, 2008. Defendant, who has convictions for at least six prior felonies, John Peoples, and Bobby Peebles were also in the store at the time, and the victim noticed Defendant, who was wearing a white shirt and green hat, "eyeing" him while he was making a transaction in the store. As the victim left the store, he noticed Defendant "off in the same direction" as John Peoples and Bobby Peebles. The victim was walking to his car and saw Mr. Peoples and Mr. Peebles walking toward him in the parking lot. As the victim opened his car door and sat down, Mr. Peoples pulled a gun out of his waistband, pointed it at the victim's head and chest, and said, "Let's go, come up off your shit, give me your stuff." The victim emptied his pockets onto the parking lot, which included his keys, wallet, cell phone, and some coins. Both Mr. Peoples and Mr. Peebles then grabbed all but the victim's cell phone from the ground. Mr. Peoples began to pat down

the victim, but he ran away when a van pulled up next to them. The victim then retrieved his cell phone, notified the store clerk of the robbery, and dialed 911. His wallet was later found and placed next to a trash container near the store; however, the contents were missing.

Defendant, who was still wearing a white shirt and green hat, John Peoples, and Bobby Peebles then went to Lena Boleyjack's house on Pinok Avenue after the robbery. Mr. Peoples and Mr. Peebles left the house, and when police arrived at the residence, Defendant "bolted" inside the house, and was eventually taken into custody by police. Upon searching Ms. Boleyjack's residence, police found a gun in the upstairs bedroom of Ms. Boleyjack's seventeen-year-old daughter. Ms. Boleyjack testified that to her knowledge, no one who lived in the house had a gun. The victim later identified Defendant, Mr. Peoples, and Mr. Peebles as the individuals who robbed him.

Sharon Campbell, one of Ms. Boleyjack's daughters, testified that she saw Defendant run upstairs after police arrived. She never saw Mr. Peoples and Mr. Peebles go upstairs. Approximately three months later, Ms. Campbell was cleaning her bedroom when she found a wallet containing Defendant's identification, social security card, bank cards, and the victim's driver's license. The wallet was then turned over to Detective William Stewart.

John Peoples testified that Defendant gave him a gun, and he robbed the victim. Mr. Peoples initially told Detective Stewart that Defendant first attempted to get Mr. Peebles to commit the robbery, but Mr. Peoples then said that he would commit the crime, and he took the gun from Defendant. Mr. Peoples then told Detective Stewart that he gave the gun back to Defendant after the robbery. Although Mr. Peoples later testified at the hearing on Defendant's motion for new trial that his trial testimony concerning Defendant handing him the gun was false, the trial court specifically said that it "put absolutely no credence" in Mr. Peoples' testimony at the motion for new trial hearing.

Based on our review of the evidence, we conclude that Mr. Peoples' testimony was sufficiently corroborated, and the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions for conspiracy to commit aggravated robbery, aggravated robbery, and felony possession of a handgun. Defendant is not entitled to relief on this issue.

*II.    Prosecutorial Misconduct*

Next, Defendant argues that the State committed prosecutorial misconduct by failing to timely disclose its knowledge that police had found a wallet in Sharon Campbell's bedroom containing Defendant's identification, Social Security card, bank cards, and the victim's driver's license. Defendant further contends that the State committed prosecutorial

misconduct by not disclosing until "just a few weeks prior to trial" that John Peoples would be called as a witness against him.

Defendant has waived this issue for failing to make contemporaneous objections to the admission of the evidence. Tenn. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of the record stating the specific ground of objection if the specific ground is not apparent from the context[.]"); Tenn. R. App. P. 36(b) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988)( waiver applies when Defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6,11-12 (Tenn. Crim. App. 1987).

Nevertheless, the trial court specifically found it was clear from the record that the discovery of the wallet and the fact that Mr. Peoples would be called as a witness were both disclosed to Defendant. The court pointed out that even without Mr. Peoples' testimony, the evidence of Defendant's guilt was still overwhelming. Defendant at no time requested a continuance upon receiving the State's discovery responses concerning the wallet and its contents or the disclosure of John Peoples as a potential witness. Defendant was aware from the beginning that Mr. Peoples was also charged in the robbery and that he had already pled guilty to the offense. The record does not reflect that the State acted in bad faith concerning the disclosure of the evidence, and Defendant in no way indicates how he was prejudiced by the disclosure or that he was unable to prepare his defense. Accordingly, Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____

THOMAS T. WOODALL, JUDGE

-12-