IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 19, 2020

## STATE OF TENNESSEE v. DONALD GARDNER

**Appeal from the Circuit Court for Cocke County**
**No. 7653    James L. Gass, Judge**

### No. E2019-01283-CCA-R3-CD

The defendant, Donald Gardner, appeals his Cocke County Circuit Court jury conviction of aggravated sexual battery, arguing that the evidence adduced at trial was insufficient to support his conviction. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Keith E. Haas, Assistant District Public Defender, for the appellant, Donald Gardner.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; James B. Dunn, District Attorney General; and Tonya D. Thornton, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Cocke County Grand Jury charged the defendant by presentment with one count of aggravated sexual battery arising from an incident involving a seven-year-old child.

At the February 2019 trial, R.C.,[1] the victim testified that she was born on August 28, 2008. Although the victim "mostly" lived with her aunt Amanda Belton at that time, she spent weekends at her mother, T.C.'s, house. When the victim was in second grade, the defendant lived with T.C. who was "helping him." The victim stated that on one occasion at T.C's house, she was taking a bath while T.C. was at the store, and the defendant came into the bathroom uninvited. The victim's godmother, Judy Davis, was in

---

[1]    To protect the identity of the minor victim, we will refer to her and her mother by their initials.

the kitchen at the time. The victim said that she screamed when the defendant came into the bathroom, but because Ms. Davis was wearing headphones, she did not hear the victim scream. The victim stated that on that occasion, as was her ordinary practice, she ran her own bath water and bathed herself. While the victim was still in the tub, the defendant touched her with his finger "in the wrong spot," which the victim explained was her front "private area." The victim stated that it hurt when the defendant touched her.

The victim got out of the bathtub and "ran to get my clothes in my room." When T.C. came home, the victim "ran to my mom and I told her about what happened." Ms. Belton was present as well. The victim stated that she told T.C. about the defendant's behavior because her mother "wants to know whenever something bad happens to me" and because "it's wrong" for an adult to touch her private parts. The victim said that T.C. and Ms. Belton started crying when she told them what the defendant had done. The victim then left with Ms. Belton to return to Ms. Belton's house "[u]ntil my mom got [the defendant] out." The victim stated that, prior to this incident, the defendant had never come into the bathroom with her, and she did not ask for his help in taking a bath.

During cross-examination, the victim stated that she saw Ms. Davis wearing headphones in the kitchen before she took a bath. She acknowledged that the bathroom door had a lock but that she "forgot to lock it." The victim recalled telling the forensic interviewer that it would have been permissible for Ms. Davis to enter the bathroom while she was bathing because she was her godmother. The victim stated that the defendant did not remove his clothing while he was in the bathroom with her.

The victim said that she had talked to numerous people about the defendant's touching her, including her guidance counselor, her nanny, Ms. Belton, the prosecutor, and some relatives. She denied that she had changed her story. She stated that when the defendant entered the bathroom, she "screamed as loud as I can." She acknowledged that she did not tell the forensic interviewer that she had screamed or that Ms. Davis was wearing headphones, explaining that she forgot to tell the interviewer about it. She also acknowledged that in the forensic interview, she said that she had locked the bathroom door. The victim stated that Ms. Davis had previously been in the bathroom with her while she was taking a bath. She acknowledged that she told the forensic interviewer two different things about the position of her legs while she was in the bathtub and that one of those statements was not truthful.

Judy Davis, the victim's godmother and T.C.'s cousin, testified that in April 2016, she lived with T.C., and the defendant also lived with them sometime that month. On one occasion, T.C. went to the grocery store, and Ms. Davis, the victim, and the defendant remained at the house. Ms. Davis was in the kitchen listening to music with headphones while the victim took a bath. The victim got in and out of the bath herself and

did not ask for help bathing. When T.C. returned home, the victim was upset and crying and went out to the car to see T.C. When Ms. Davis went outside, T.C. was angry with the defendant, and Ms. Davis said she had never before seen T.C. that angry.

During cross-examination, Ms. Davis stated that she had seen the victim in the bathtub that day when she went into the bathroom, but she knocked before entering. She acknowledged that the door was unlocked. She then went back to the kitchen to listen to music. She did not know where in the house the defendant was at that point.

T.C., the victim's mother, testified that she had lived at 639 Myers Circle in Newport in Cocke County for the past six years. In April 2016, Ms. Davis lived with her, and the victim lived there part time. The victim primarily lived with T.C.'s sister, Ms. Belton, who took the victim to school and helped T.C. "a lot" because T.C. did not have a vehicle. T.C. stated that she met the defendant on an online dating platform. The defendant was homeless at the time and asked T.C. if he could stay with her for a period, and she agreed. She estimated that she had known the defendant for a couple of months before he came to stay with her. The defendant stayed with her for approximately one week in April 2016.

During that period, Ms. Belton had trouble with the water at her house, and the victim had to bathe at T.C.'s house. T.C. stated that the victim had bathed herself since she was five years old, running her own water and drying off herself. On the day of the incident at issue in this case, T.C. and Ms. Belton went to the store while the victim was in the bath. When they arrived back at the house, the victim "ran to the car" and told her that the defendant had "touched her" "[i]n her private area" while she was in the tub. The victim "was hysterical and -- and crying and she was just tore up." T.C. stated that she "snapped" and punched the defendant and told him to leave. Ms. Belton took the victim with her and the left the house. T.C. stated that she never asked the defendant to help give the victim a bath.

T.C. stated that she did not immediately contact the police or the Department of Children's Services ("DCS") because she "didn't know what to do" and "was still shocked that it happened." DCS, however, came to her house one or two days later because the defendant reported T.C. to DCS, which he had said that he would do when T.C. kicked him out. The DCS agents told T.C. that they were there because of an allegation that she was smoking marijuana in the house. T.C. acknowledged that she did smoke marijuana at the time but stated that she did not smoke or drink in front of the victim. During her interview with the DCS agent, she told him about the defendant's abusing the victim because she "just felt like . . . somebody needed to know." She denied that she made the story up as revenge for the defendant's reporting her to DCS.

T.C. acknowledged that the victim had lied to her in the past, stating that she could tell when the victim was lying because "she looks funny when she lies. She gives you a weird, like, sneaky look when she lies." She reiterated that the victim "was crying and in tears" when she reported the defendant's conduct and that she had "never seen her like that."

During cross-examination, T.C. stated that when she told the defendant to leave her house, he told her that he was going to report her to DCS for smoking marijuana and drinking in front of the victim, but T.C. maintained that she had not done so. The victim's usual schedule was to live with Ms. Belton from Sunday evening through the week days and with T.C. from Friday evening through the weekends. T.C. acknowledged that she tested positive for the use of marijuana in the drug test administered by the DCS agent and that the agent found a bong in her house. She also acknowledged that her older daughter had once been removed from her care by DCS when that daughter was six years old. She stated that she had a working telephone at her house and that she knew how to contact the police.

DCS agent Rodney Freeman testified that on April 12, 2016, he was referred to T.C.'s home for an allegation of "environmental neglect and drug exposed child." The next day, he interviewed the victim at her school for approximately 20 minutes; the victim had no "knowledge of drug use in the home" and did not report any sexual abuse. He then interviewed T.C., Ms. Davis, and Ms. Belton. While at T.C.'s house, he found "what appeared to be a bong in the closet" during a search of the house. T.C. admitted to him that she smoked marijuana, but she denied that she did so in front of the victim. T.C. then told him that only a few days prior, the defendant had inappropriately touched the victim. Mr. Freeman explained that when he interviewed the victim at school, he asked her "questions about domestic violence and discipline and whether or not anybody ha[d] ever touched" her because it was his practice to "always do a minimum fact-finding" interview "[r]egardless of what the allegations are." When Mr. Freeman asked her about sexual abuse, the victim "shrugged her shoulders and said nobody had ever touched her private parts." After learning of the allegation of sexual abuse from T.C., Mr. Freeman scheduled a forensic interview for the victim. During the forensic interview, which Mr. Freeman viewed by a live camera feed, the victim told the interviewer that the defendant had touched her.

During cross-examination, Mr. Freeman explained that he did not tell the victim what allegations had been made against T.C., but he asked her questions such as whether she had seen her mother "or anybody at their home snorting anything into their nose or give themselves shots or smoke something that smells funny." He reiterated that the victim denied having been touched inappropriately when he interviewed at her school. He stated that T.C.'s drug screen revealed the presence of marijuana and benzodiazepines

in her system. He interviewed Ms. Belton at her home, and he did not find anything concerning there. He acknowledged that DCS had previously been involved with T.C. regarding her older daughter.

After a *Momon* colloquy, the defendant elected not to testify.

Being recalled by the defendant, T.C. denied telling Mr. Freeman that the victim had reported that the defendant washed her in the bathtub.

On this evidence, the jury found the defendant guilty as charged. After a sentencing hearing, the trial court imposed a sentence of 12 years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the evidence at trial is insufficient to support his conviction.

*Sufficiency of the Evidence*

The defendant contends that the State failed to present sufficient evidence to establish that he knowingly and intentionally made sexual contact with the victim or that any contact was for the purpose of sexual arousal or gratification. The State asserts that the evidence is sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Our Code defines aggravated sexual battery, as relevant to this case, as follows: "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [and t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . ." *Id.* § 39-13-501(6). "'Intimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast

of a human being . . . ." *Id.* § 39-13-501(2).

Here, the evidence taken in the light most favorable to the State established that when the victim was seven years old, the defendant entered the bathroom while the victim was taking a bath and touched her genital area. The defendant did so while the victim's mother was out of the house and while her godmother was listening to music in the kitchen and unable to hear activity in the bathroom. Under these circumstances, a rational jury could have found that the defendant intentionally touched the victim's vaginal area and could reasonably construe the touching as being for the purpose of sexual arousal or gratification.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-6-