IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 27, 2020 Session

## STATE OF TENNESSEE v. JOHN WILLIAM ANDERSON

**Appeal from the Criminal Court for Sullivan County**
**No. S66420     James F. Goodwin, Jr., Judge**

_____

### No. E2019-01156-CCA-R3-CD

_____

The defendant, John William Anderson, appeals his Sullivan County Criminal Court jury convictions of attempted theft of property valued at $10,000 or more but less than $60,000 and criminal simulation. He challenges the sufficiency of the convicting evidence and the propriety of the sentencing decision of the trial court. The evidence was sufficient to support the convictions, but the trial court erred by imposing a sentence in the absence of a presentence report. Consequently, we affirm the defendant's convictions but reverse the sentencing decision of the trial court and remand the case to the trial court for a new sentencing hearing.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed in Part; Reversed and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick S. Rader (on appeal) and W. Andrew Kennedy (at trial), Assistant District Public Defenders, for the appellant, John William Anderson.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Barry P. Staubus, District Attorney General; and P. Michael Filletti, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In June 2016, the Sullivan County Grand Jury charged the defendant via presentment with one count of attempted theft of property valued at $10,000 or more but less than $60,000; one count of identity theft; and one count of criminal simulation. In February 2019, a superseding presentment added one count of forgery.

At the March 2019 trial, Kingsport Police Department Detective Ray Mailloux testified that on November 16, 2015, he was working as a patrol officer when he responded to a call "of a possible fraudulent check" at the TriSummit Bank on East Stone Drive in Kingsport. When he arrived, a bank employee informed him "that they had a gentleman come in who tried to open up a new account" using "a check that was in the amount of, like, $13,000 and some change from a Whole Foods Market company." Bank employees "later were able to determine that the check was a fraudulent or fake check." Detective Mailloux took possession of the check on that day.

Karen Pierson testified that she was working at the TriSummit Bank on East Stone Drive on November 16, 2015, when the defendant came in with "a check for a large amount, and he wanted to either cash it or open a new account to deposit it." Ms. Pierson told the defendant, whom she said looked "out of place," that she could not cash the check but that she could assist him with opening a new account. She explained to the defendant that the bank would "deposit the funds and hold the funds to make sure that the check was going to be good," which was the standard procedure for new accounts. The defendant agreed, opened a new account, and left the check for Ms. Pierson to deposit into the new account.

After the defendant left, Ms. Pierson telephoned Whole Foods "to verify that the funds were either good or not good; that the check was real or not." During that conversation, Ms. Pierson confirmed "that this was a fraudulent check. That they had not written it to this individual." At that point, she telephoned the police.

During cross-examination, Ms. Pierson acknowledged having said that she was concerned that the defendant should have a check for such a large sum because he looked as though he might be homeless. She agreed that the defendant did not become angry when she said that the bank would not be able to cash the check.

The State next presented the previously-recorded sworn testimony of John Hempfling, Associate General Counsel for Litigation at Whole Foods Market Services, Inc. Mr. Hempfling testified that he searched the company database and learned that no person named John W. Anderson had ever worked as an employee at Whole Foods. Mr. Hempfling explained that the majority of employees were paid via direct deposit but that, for those who received paper checks, the checks would come from the separate corporate entity in the region where the employee worked. By way of example, Mr. Hempfling pointed out that the stores "in Tennessee were owned by a company called Whole Foods Market Group Inc. and I work for Whole Foods Market Services Inc." He said that, in no instance, would any check bear "just a generic Whole Foods Market stamp on it."

Mr. Hempfling identified the check that the defendant left for deposit at the TriSummit bank as "a vendor check" "that is made out for $13,187.50 to John W. Anderson." Mr. Hempfling searched the accounts payable database and learned that Whole Foods had never paid any money to a vendor named John W. Anderson. He explained that "in order to be set up as a vendor with Whole Foods Market, any entity, you have to . . . submit a W9 and other paperwork that can set you up to receive electronic payments or even a check" and that "[i]n this instance there was no vendor that was set up under John W. Anderson." Mr. Hempfling discovered that the bank account number and check number were legitimate and that a check bearing that number had been "made out to Willie's Greenhouse Limited, which is a greenhouse of some sort up in Ontario, Canada" in the amount of $3,187.50. Mr. Hempfling observed that the typeset of the check that the defendant presented at the TriSummit bank was "very block in manner" while the typeset of legitimate Whole Foods checks was "bolder and they've got a slant to them in the writing." He also observed that "the zero on this check for the 13-187-50 kind of runs almost off the check. I've never seen that before on a vendor check."

During cross-examination, Mr. Hempfling testified that he could not say that the check presented by the defendant for deposit was the actual check that had been tendered to Willie's Greenhouse but said that "[i]t appears to be a . . . real check but exactly how your client came into it I don't know." He said that Whole Foods stopped payment on the check to Willie's Greenhouse.

After a full *Momon* colloquy, the defendant elected to testify. He agreed that he presented the check in the amount of $13,187.50 purportedly payable to him and issued by Whole Foods. He claimed that the check was "sent to me by an online check friend." He said that he was "dealing with" four or five such "online check friend[s]" in November 2015 but that he believed the person who sent him the Whole Foods check was a woman named Pasona Lasad. The defendant testified that he had been communicating with Ms. Lasad for four or five years via the internet. He also testified that he "had several people sending me checks. That's why as soon as I walk in, I ask them, 'Can you verify this before I try to do anything with it?'" The defendant said that he and Ms. Lasad had become close and that at some point, she approached him about the check. He explained:

> Due to the nature of work, which is selling statuary and interior decorations, stuff like that, she's constantly traveling. She's collecting money from all over the world, and she was having trouble getting it -- you know, catching up with her money.
>
> So she sent me this check so that I could open an account, and then anybody paying would pay into it, and then

-3-

I could disburse to her as she needed, wherever she was at. That way her money kept coming in and she had full and complete access to it.

He said that he planned to open a joint account in both their names, "That way she could have access to her money. And I could do whatever needed doing in-between." The defendant said that it was his understanding that "[t]he guy from Whole Foods was going to send it to me for work she had done for him that he owed her for." He maintained that he did not find the proposed scheme to be odd "[b]ecause she told me that she had done work for the guy and he owed her, and that was how he was going to pay."

The defendant acknowledged that he had no records of his conversations with Ms. Lasad. He claimed that he had "gone back years trying to find them. And I found out I've got 11 different computers using my IP address. And somebody has been in there messing with my messages, and I can only go so far back." He said that "[s]omebody went in and changed my password so I can't even get in" the "hangouts."

The defendant said that he did not feel nervous when he went to the TriSummit Bank to deposit the check. He claimed that he asked Ms. Pierson to verify the check for him and that she said the bank did not do that. Instead, "she took her little Post-It note; she wrote their number, their verifier's number on it." He testified that he "went up to the parking lot right there under the camera. I called the verifier. I gave them all the numbers, all the information" and that he was told that "'the check is valid, legal, good, ready for further processing.'" He said that after verifying the check, he went back inside the bank and presented the check for the purpose of opening a bank account.

The defendant testified that Ms. Pierson told him the bank would put a hold on the funds for 13 days, so after the passage of 13 days, he went to the bank and approached a teller with the ATM card he had received in the mail. At that point, the teller told him that the check had not cleared. He said that he apologized to her and told her that he would return to open the account "'without all this rigamarole'" when he had sufficient cash to do so. He insisted that he did not attempt to defraud the bank or Whole Foods. Instead, he claimed that he believed the check to be legitimate because "[i]t came to me on Whole Foods check stock. It was inside a Whole Foods envelope. And then all of that down inside of a FedEx or UPS envelope with their address as the sending address."

During cross-examination, the defendant testified that at the time of the offenses, he was receiving checks from "a couple of girls that I w[as] talking to, they -- according to them -- take care of, like, what started out as a[n] orphanage and ended up a refugee center in Africa where all this was going on." He said that individuals "would send donations to these girls. And they could only go to the Walmart MoneyGram . . . once per

day. So they would have them send -- each one would send their five, ten, $20 to me. And then I'd get a lump sum. Then I'd go and send them all in one check to them." The defendant acknowledged that he would keep "five, $10 gas or a little something or another" but said that he "never got rich" because he "couldn't at the expense of the orphans." He said that another girl sent him "a couple of cell phones, a couple of computers" and that he "would sell them for whatever I could get and then send the money on."

The defendant insisted that he did not find the amount of the check to be unusual given "the quality of work that she was carrying on," saying that $13,000 "sounded like a pretty low price." He said that she created "[s]tatuary. You know, like, when you're decorating your home and you want a -- a Venus or something or, you know, just interior decorating." He said that the check was payment for work she had done for "[o]ne customer at Whole Foods, the guy who sent me the check." The defendant could not remember the name of the man who had sent him the $13,187.50 check. He testified that he called "TriSummit's check verifier" to determine that the check was good and that he had "never talked to anybody at Whole Foods."

Based upon this evidence, the jury convicted the defendant of attempted theft of property valued at $10,000 or more but less than $60,000 and criminal simulation of an instrument valued at $10,000 or more but less than $60,000 but acquitted him of forgery.[1] Following a sentencing hearing, the trial court imposed concurrent, Range II sentences of six years and eight years, respectively, to be served on supervised probation.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this timely appeal, the defendant challenges the sufficiency of the convicting evidence and the sentencing decision of the trial court.

*I. Sufficiency*

The defendant asserts that the evidence was insufficient to support his convictions because the State failed to establish the necessary mens rea for either offense. The State contends that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331

---

[1] The State dismissed the count charging identity theft prior to trial.

S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Criminal attempt is committed when a person, "acting with the kind of culpability otherwise required for the offense," does one of the following:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a).

"A person commits the offense of criminal simulation who, with intent to defraud or harm another . . . [possesses] an object so made or altered, with intent to sell, pass or otherwise utter it." T.C.A. § 39-14-115(a)(1)(B).

In the light most favorable to the State, the evidence established that the defendant took a check for $13,187.50 to the TriSummit Bank and, after learning that he could not cash the check, attempted to open a bank account using the funds from the check. Mr. Hempfling's testimony established that both the payee and the amount had been altered. After the passage of two weeks, the defendant returned to the bank with the ATM card that had been issued to him for the purpose of accessing the funds from the check. This evidence established that the defendant intended to gain access to the funds, which was sufficient to establish that he attempted to obtain the funds and that he intended to

deprive Whole Foods of those funds. The defendant admitted that he had not performed any work for Whole Foods. Although he offered an innocent explanation for his having the check, the jury, as the final arbiter of the facts, was free to reject any or all of his testimony. In our view, the evidence was sufficient to support both of the defendant's convictions.

## II. Sentencing

The defendant asserts, and the State concedes, that the trial court erred by imposing a sentence in the absence of a presentence report. With the exception of certain circumstances not applicable in this case, Code section 40-35-205 requires the trial court "in the case of a felony" to "direct the presentence service officer to make a presentence investigation and report." T.C.A. § 40-35-205(a). The Code also mandates the contents of the report, *see id.* § 40-35-207, and the trial court's consideration thereof, *see id.* § 40-35-210(b)(2). Consequently, the trial court erred by sentencing the defendant in the absence of the presentence report, and we remand the case to the trial court for a new sentencing hearing following the preparation of the presentence report.

In a related issue, the defendant asserts that the trial court erred by imposing the fines set by the jury without first considering the defendant's ability to pay. The State did not address this issue in light of its concession that a new sentencing hearing was warranted in this case. This court has held that "[t]he trial court's imposition of a fine, within the limits set by the jury, is to be based upon the factors provided by the 1989 Sentencing Act, which include 'the defendant's ability to pay that fine, and other factors of judgment involved in setting the total sentence.'" *State v. Marshall*, 870 S.W.2d 532, 542 (Tenn. Crim. App. 1993) (quoting *State v. Bryant*, 805 S.W.2d 762, 766 (Tenn. 1991)). That being said, "the defendant's ability to pay a fine . . . is not necessarily a controlling" factor, and "a significant fine is not automatically precluded just because it works a substantial hardship on a defendant—it may be punitive in the same fashion incarceration may be punitive." *Marshall*, 870 S.W.2d at 542. Thus, upon remand, the trial court should consider the defendant's ability to pay the fines as set by the jury.

Accordingly, the defendant's convictions are affirmed but the sentencing decision of the trial court is reversed, and the case is remanded for a new sentencing hearing.

_____
JAMES CURWOOD WITT, JR., JUDGE

-7-