IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on briefs July 7, 2021

## STATE OF TENNESSEE v. BRANDON DESHUN MCALISTER

**Appeal from the Circuit Court for Madison County**
**No. 19-326    Kyle Atkins, Judge**

_____

### No. W2020-00651-CCA-R3-CD

_____

Aggrieved of his Madison County Circuit Court jury convictions of aggravated assault and unlawful possession of a firearm, the defendant, Brandon Deshun McAlister, appeals, challenging the sufficiency of the convicting evidence.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and JILL BARTEE AYERS, JJ., joined.

J. Colin Morris, Jackson, Tennessee (on appeal); and William M. Harris, Assistant District Public Defender (at trial), for appellant, Brandon Deshun McAlister.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Joshua B. Dougan, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Madison County Grand Jury charged the defendant with one count of especially aggravated kidnapping, two counts of aggravated assault, and one count of unlawful possession of a firearm after having been convicted of a crime of domestic violence for acts perpetrated against the victim, Faith Carter, in November 2018.

At the February 27, 2020 trial, Jackson Police Department ("JPD") Officer Julie Millikin, who was working as a patrol officer on November 11, 2018, testified that she was wearing her body camera, which was capable of both audio and video recording, when she responded to Jackson General Hospital to interview the victim.  When Officer Millikin arrived at the hospital, she found the victim "in one of the trauma rooms" speaking to Officer Millikin's partner, JPD Officer Krohn Stowe.  "The first thing" that Officer

Millikin "noticed with [the victim] was . . . half her face was pretty swollen and bruised up pretty badly." The victim told Officers Millikin and Stowe that the defendant had inflicted the injuries on her.

Officer Millikin photographed the victim's numerous "injuries throughout her entire body from head to toe." Photographs of the victim exhibited to Officer Millikin's testimony show extreme bruising and swelling on her face. The left side of her face was so swollen, in fact, that "she actually had difficulty occasionally opening her left eye," and her lips were barely distinguishable from the rest of her face. The victim's lips were "busted, bruised, blue," and swollen. Additionally, the victim suffered "a burn on the inside" of her bottom lip, and the victim explained "that she was burned with a lit cigarette." The victim had extensive bruising on "her buttocks" and, indeed, "across the entire back end" as well as "wrapping all around her entire right leg" and "all the way down to the ankle" of her left leg. There were bruises on "the inside of her elbow." The victim told Officer Millikin that the defendant had held her by the neck, and photographs confirmed the presence of "striations across the . . . neck where she had been held." The victim had "a bite mark with bruising on the inside of it" on "the back of her right shoulder"; the bite wound "had just a little bit of scabbing, so it had been there for just a little while." She had been burned with a lit cigarette "right above her anus" and "right above the pelvis."

Officer Millikin testified that the victim told her that "her boyfriend," the defendant, had inflicted the injuries over the course of "the last two weeks of time." The victim reported "that she was actually held" in "her room of her house" by the defendant and "that the only time she was allowed to go was to go . . . retrieve him money." The victim also reported that "she was actually at the hospital the week before," having left on the pretense of getting money for the defendant, "to get medical help for the injuries she had already had" at that point. The victim said that the defendant had a firearm and that "he would point it at her occasionally, hold it to her head occasionally, and make her hold it to her head occasionally. And then he would hide it so she couldn't get to it to get away." Following her release from the hospital, the victim "found the gun," a Smith and Wesson SD 40 handgun, "underneath all of the drawers" at the bottom of a dresser in the room where she had been held. Officer Millikin recalled that officers actually located the defendant "in that room and took him into custody" on November 11, 2018, but were unable to locate the firearm on that day.

During cross-examination, Officer Millikin acknowledged that she was aware that the victim had given statements saying that the defendant did not actually inflict the injuries on her but said that she had not spoken with the victim since the initial interview.

JPD Officer Kurtis Krohn Stowe testified that on November 11, 2018, he

-2-

"was dispatched to the hospital in regard to an assault report." When he arrived at the hospital, he found the victim in a trauma room and immediately noticed "her extremely swollen face," which he described as unlike anything he had seen before. The victim "was pointing at her lips a lot, like she had burns inside of her lips. She had bite marks on her." Officer Stowe said that the victim tried to show him other injuries, but he waited until a female officer could "come in and look at those." Officer Millikin arrived shortly thereafter and took over the interview.

The victim's grandmother, who arrived at the hospital shortly after Officer Millikin, gave Officer Stowe a key to her house, where the victim had been living, "to go inside and make sure [the defendant] wasn't there." Officer Stowe testified that he and a supervisor went to 77 Courtland Street in Jackson and, when other officers arrived, knocked on the door, but no one answered. At that point, officers used the key to enter and clear the residence. After officers entered the house, they announced themselves again, "and as we were clearing it, there was one door that was locked" from the inside. They knocked on the door, and, after "a few minutes," the defendant "came out of the room." He was placed into custody and transported to the police station. Officers conducted a "very brief search" of "the immediate vicinity" where the defendant was taken into custody but did not conduct "a thorough search" because they "didn't have that permission at that time."

Later that same day, the victim called the police following her release from the hospital, and, in response to her call, Officers Millikin and Stowe went to her grandmother's residence. The victim had located the handgun "that was supposedly used during . . . this timeframe." Officer Stowe recalled that the victim "had the bottom drawer of the dresser pulled out and she was holding a gun, kind of cupped in her hands."

During cross-examination, Officer Stowe acknowledged that he was aware that the victim had written two letters purporting to absolve the defendant of guilt for the injuries inflicted upon her.

Portions of the body camera footage from the officers' initial contact with the victim at the hospital were admitted into evidence and played for the jury. The footage confirmed the officers' recollection of the victim's statements and documented the brutality of the attack on the victim. Particularly relevant to the issues on appeal, the victim told the officers that the defendant had "choked me until I turned blue," that he had held her at gunpoint, and that he had burned her with lit cigarettes and a make-shift blowtorch fashioned by lighting spray furniture polish with a lighter.

JPD Sergeant Jay Stanfill, who became the lead investigator in the case, testified that he met with the victim on November 12, 2018, at the police station. During

that meeting, Officer Olivia Johnson photographed the victim's injuries. The photographs depicted heavy bruising on the left side of the victim's face, "what appears to be consistent with a human bite" on her right shoulder, a large bruise "below her navel," and bruising and "some type of injury . . . above the nipple on her right breast." Investigator Stanfill said that the victim "was in a lot of pain still" and "had difficulty coming in and out of the building and . . . standing up or sitting down." He described the victim's demeanor as "broken" and "meek." At the end of the interview, he drafted a written statement, putting the victim's oral recitation "into words that are logical." He said that the victim read the statement and was encouraged "to change it at any time, add, subtract, take away or tell us what's wrong." Thereafter, she signed the statement in red ink, in three different places, and "initialed at the beginning and end of each page," and it was adopted as her "statement of the incident."[1]

In her statement to Investigator Stanfill, the victim again identified the defendant as the person who had inflicted the grievous injuries on her. She said that she and the defendant had dated for years without any violent incident until August 2018, following her release from jail. The victim recalled that the defendant "had been accusing me of cheating on him before I went to jail" and that "[i]t got worse when I got out." She said that the defendant struck her and called her a liar. The violence in the relationship only escalated thereafter, with the defendant punching, kicking, and hitting the victim "more often" while continuing to accuse her of infidelity, drug use, and prostitution. The victim recalled a specific occasion when the defendant struck her "hard on the face," breaking her nose. The victim said that she had "passed out" "at the clinic" on Monday November 5, 2018,[2] and "went by ambulance to the ER. I had been lightheaded. Thursday I went back to the ER." The victim told Investigator Stanfill that, on Friday, November 9, the defendant "made me open my mouth" and "stick my tongue out" while they were "in my room on Courtland." "He burned my lip, tongue, and left eye with a lit cigarette. It was Newport 100s." "He held a gun to my head Saturday morning" and "made me touch the gun and the bullets, told me he would kill my grandmother and then me and make it look like I did it." The next day, he "beat me again" after her grandmother went to work and then made her walk "to the Walgreens Sunday early in the morning." She maintained

---

[1]     Following a pretrial hearing, the trial court indicated that, should the victim fail to appear for trial, the State would be permitted to admit her statement to Investigator Stanfill as substantive evidence under the terms of Tennessee Rule of Evidence 804(b)(6), which permits the admission of "[a] statement offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness." Tenn. R. Evid. 804(b)(6); *see also* Tenn. R. Evid. 804(a)(2) (a declarant is unavailable when they "persist[] in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so"). At this same hearing, for reasons that are unclear from the record, the State agreed that the defendant would be permitted to admit into evidence the two obviously inadmissable "sworn statements" made by the victim exculpating the defendant.

[2]     The victim did not mention a specific date, but we take judicial notice that the Monday before Thursday November 8, 2018, was November 5.

that the defendant "wouldn't let me sleep." She said that the defendant "had twisted and pulled on my nipples and my clitoris with wire pliers -- or pliers while we were in my room." At some point, he also forced her to "cut my wrist with the knife part of the pliers." The victim said that she "went to the ER Sunday morning" and told them "I was hurting and my boyfriend had beat me. An officer was there. I told them what had been happening."

Investigator Stanfill also interviewed the defendant on November 12, 2018. After being provided with *Miranda* warnings, the defendant told Investigator Stanfill that he and the victim "had been together on and off and met in A School, which is an alternative school when they were younger." The defendant "advised us that they had been in an altercation over the past several days, but he would not be specific." When questioned "about the possession of a firearm," the defendant "described the firearm as a Smith & Wesson .40 caliber. It was black and silver." The defendant also said, however, "that he had sold it but he doesn't know who to and he doesn't remember when he had sold that." Investigator Stanfill described the defendant as "[v]ery unappreciative of the seriousness of the case, the charges, and the allegations." The defendant told officers that he believed that the victim "was having an affair with . . . his mother's boyfriend" and "that God had sent him to take care of her, essentially had made their paths cross, that he's making her a better person, and that, like most women, . . . she wants to give him money all the time." The defendant insisted that "he had not done anything wrong" and that "whatever she's going through is not his problem," "[b]ut he did admit to the altercation and having the .40 caliber Smith & Wesson gun." Investigator Stanfill said that the defendant "did not provide any statements to us about the specifics . . . that would explain the totality of her injuries." The defendant refused to "allow us to draft a statement and sign it."

Investigator Stanfill testified that he had reviewed the "jail logs and jail phone calls" and learned "that there have been several hundred calls made from the Madison County Jail by an individual or the defendant, using the defendant's personal identification number" to the victim between November 12, 2018, and February 27, 2020. Additionally, the victim had visited the defendant at the Madison County Sheriff's Department "in excess of 75" times.

Investigator Stanfill agreed during cross-examination that he learned at an earlier hearing that the victim had drafted two statements purporting to exculpate the defendant of the charges in this case. One, bearing the victim's signature and a notary seal and the date of April 15, 2019, said:

> To whom this may concern: On behalf of my case for Brandon
> McAlister, I'm writing this to have all charges dropped against
> him. He was not the one who did those horrible things. All

charges against him are all false.

> The letter I received with his charges on it, I do not recall any of those. This is a misunderstanding. I don't want him to serve any more time and he deserves to be free to live his life. I don't want to go through with this.

The second letter, which also contained a notarized signature and bore the date of June 1, 2019, stated:

> To whom this may concern: I'm writing this letter on behalf of my case with Brandon McAlister. I want to inform the DA, Judge Atkins, John D. Hamilton, and Kathy Blount that Brandon McAlister wasn't the one who kidnapped me or assaulted me. I choose not to discuss or go into details about it, but I do highly recommend letting him go for a crime he hasn't committed. I want to marry him.

> I want all charges as I stated in the last letter to be dropped. I do not choose to go any further in this case, as I have already stated before.

JPD Sergeant Chad French reviewed some of the telephone logs as well as some of the telephone calls that the defendant had placed from the jail. He found 482 occasions "where his account called [the victim's] number" between November 10, 2018, and February 27, 2020. The total amount of time spent actually on the calls between the defendant and the victim's number was 25 hours, 15 minutes, and 19 seconds. Sergeant French "listened to probably four or five of those calls, which may have totaled twenty or thirty minutes." In the calls, the defendant repeatedly and vehemently told the victim in no uncertain terms that she should not communicate with the district attorney's office and should refuse to answer any of their questions.

Cinda Gee, a therapist and clinical program manager for WRAP, "a women and men's resource and rape assistance program, which is a domestic violence and sexual assault victims' service agency," testified as an expert "in the field of victim dynamics." Ms. Gee testified that victims of domestic abuse sometimes develop "a trauma bond" with their abuser, which was sometimes called "Stockholm Syndrome" or "Battered Woman Syndrome." She likened the violence visited upon domestic abuse victims to "a hostage situation," saying, "You become a hostage to violence." She explained that the trauma bond created during an abusive relationship developed as a survival mechanism and that, even when removed from the primary abusive situation, "we just can't turn that off." As a

-6-

result, "[t]here's high levels of empathy for somebody who's very violent towards you." She said that, with therapy and a strong support system, victims could "start living a normal life" provided they had no "contact whatsoever" with their abuser. "If there's any contact at all, then the trauma bond is perpetuated." Continuing contact, she said, would foster a feeling "that they're keeping their familiar safe." She added that, because domestic violence victims have an "inherent investment" in the relationship with their abuser, "they can minimize instances of violence. And this is very, very common, that they ignore them, they minimize them, they downplay them, they blame other things." Ms. Gee said that abusers use affirmations of love, apologies, and promises of marriage or monetary gain to draw victims back to them. This creates "kind of this cycle of honeymoon and then violence and then honeymoon, and then it just cycles endlessly." She testified that fear and shame could motivate a victim to refuse to participate in the criminal justice process. Additionally, she said, "[t]here can be this feeling that they were at fault somehow in the violence and that they caused it somehow." Ms. Gee stated that, "[o]nce the trauma bond mentality has reinstated itself, then it's going to dominate. The attachment is extremely hard to break." In that situation, "victims have hope that the relationship will somehow become good, that they can have something out of it for the investment that they put into it."

Following a full *Momon* colloquy, the defendant elected not to testify and chose to present no proof. Based upon the evidence presented, the jury acquitted the defendant of especially aggravated kidnapping as charged in Count One but convicted him as charged of two counts of aggravated assault and one count of unlawful weapons possession as charged in the remaining counts.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges only the sufficiency of the convicting evidence, arguing that the "sworn statements" of the victim attesting his innocence rendered the evidence insufficient to support any of his convictions.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.

*Id.*

As charged in this case, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [i]nvolved the use or display of a deadly weapon; or . . . [i]nvolved strangulation or attempted strangulation."  T.C.A. § 39-13-102(a)(1)(A)(iii)-(iv).  For purposes of the aggravated assault statute,

> "strangulation" means intentionally or knowingly impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person, regardless of whether that conduct results in any visible injury or whether the person has any intent to kill or protractedly injure the victim.

*Id.* § 39-13-102(a)(2).  "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty."  T.C.A. § 39-11-106(3).  "Deadly weapon" means . . . [f]irearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or . . . [a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury."  *Id.* § 39-11-106(6).

"A person commits an offense who possesses a firearm, as defined in § 39-11-106(a), and . . . . [h]as been convicted of a misdemeanor crime of domestic violence as defined in 18 U.S.C. § 921, and is still subject to the disabilities of such a conviction."  T.C.A. § 39-17-1307(f)(1)(A).  A "misdemeanor crime of domestic violence" is

> an offense that--
>
> (i) is a misdemeanor under Federal, State, or Tribal law; and
>
> (ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

18 U.S.C.A. § 921(a)(33)(A).

-8-

The evidence adduced at trial established that the victim arrived at the hospital badly beaten. The injuries inflicted upon the victim in this case were absolutely appalling. She bore bruises to nearly every part of her body; her face, in particular, was remarkably swollen and bruised. She had burns on the inside of her mouth, above her pubic area, and near her rectum, which injuries she told officers the defendant had inflicted with a lit cigarette and a make-shift blowtorch. She had a human bite mark on her shoulder. The victim told officers that the defendant had choked her into unconsciousness, threatened her at gunpoint, and pinched her nipples and clitoris with "wire pliers." She described the firearm wielded by the defendant, and, following her release from the hospital, directed them to its location. The defendant admitted having previously owned a weapon like the one described by the victim and found by the officers but claimed that he had sold it.

The defendant does not challenge the elements of the offenses but instead "argues that the sworn statements of [the victim] illustrate that the evidence was insufficient." As an initial matter, the defendant's characterization of the documents as "sworn statements" based upon the presence of the notarization "overlooks the fundamental distinction between a jurat and an acknowledgement." *D.T. McCall & Sons v. Seagraves*, 796 S.W.2d 457, 462 (Tenn. Ct. App. 1990). The documents in question are typewritten and contain the victim's signature with a handwritten date. Each bears a notary seal but not a notary signature. Instead, the notary's signature appears on a separate slip of paper, above which appears the following:

> On this the ___, day of _____ 20 ___, this instrument was signed or acknowledged before me by _____.

The date and the victim's name appear in the blanks. Neither the documents themselves nor the notary's acknowledgment indicate that the victim was placed under oath or that the statements made therein were made under oath. Neither contains an affirmation that the contents of the document are true and correct. Notably absent is a jurat indicating that the documents were "sworn and subscribed before" the notary.[3] Indeed, the certificate accompanying the notary signature indicates only that the instrument was "signed or acknowledged before me" and not that the notary administered an oath or affirmation to the signer. Consequently, the documents are nothing more than letters that contain the victim's notarized signature, and neither qualifies as a "sworn statement."

More importantly, however, the defendant's argument overlooks the fact that the jury, as the judge of both the facts and the law as well as the final arbiter of witness credibility, considered both documents alongside the other evidence at trial, including the victim's initial interview with the police as well as her statement to Investigator Stanfill.

---

[3] "A jurat is a certificate of the official or person before whom a writing is sworn to." *D.T. McCall & Sons*, 796 S.W.2d at 462 n.2 (citations omitted)

Neither document bore talismanic power to override the other evidence offered by either the defendant or the State. As was its prerogative, the jury chose to accredit the evidence offered by the State and convict the defendant. In our view, the evidence adduced at trial was more than sufficient to support the defendant's convictions.

*Conclusion*

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE