IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 15, 2022 Session

**STATE OF TENNESSEE v. GARY WOOD**

**Appeal from the Criminal Court for Knox County**
**No. 115166    Steven W. Sword, Judge**

**No. E2021-01536-CCA-R3-CD**

The defendant, Gary Wood, appeals his Knox County Criminal Court jury conviction of theft of property valued at $2,500 or more but less than $10,000, arguing that the evidence was insufficient to support his conviction.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and JOHN W. CAMPBELL, SR., JJ., joined.

Spencer Warren Reed, Knoxville, Tennessee for the appellant, Gary Wood.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury charged the defendant with one count of theft of property valued at $2,500 or more but less than $10,000 arising from the taking of a trailer from the business of Andrew Petty.

At the May 2021 trial, Andrew Petty testified that he worked as a professional welder and that he owned Petty's Welding Company "[i]n east Knoxville, off Magnolia Avenue." He testified as an expert in welding.  He said that the tools he used in his business were commercial grade and "much more expensive than the things you would go pick up at Home Depot or Lowe's."  He explained that "[w]elding's a very specialized line of work" and that "[w]e work with heavy steels, things that . . . most people can't maneuver and pickup . . . .  And so you've got to have special tools to put holes in things in certain locations that will allow you to cut this material at this speed so that the material can be

refused for welding."

Mr. Petty testified that in November 2018, a trailer was stolen from his business. He described the trailer as "16 feet long" with "a flat-deck" and "specialized to be loaded from . . . both sides and the rear." He used the trailer to "haul weldments that weigh thousands of pounds" and said that the trailer was designed in a way that "you can access the sides of the trailer with a forklift and not be reaching over fenders and railings and running into rails. So that's what made this trailer specialized." The trailer "had very high ten-ply tires that were very short, which allowed the deck to be really low so that you could onload and offload from a reasonable height, making the trailer more stable on the road, as well." He said that he purchased the trailer in 2010 or 2011 and, although he could not remember how much he paid for the trailer at the time, he said that it was in "[v]ery good" condition when it was stolen.

Mr. Petty said that he noticed the trailer had been stolen when he instructed an employee to hook up the trailer for a job and the employee told him the trailer was not there. He reviewed security camera footage from the business and found "three different video clips that we have of the trailer being stolen," which videos he provided to the police. The jury viewed the video clips. One video clip showed a green pickup truck pulling into the business without a trailer and turning around. The second clip showed the pickup truck backing up along the side of the building and a man getting out of the truck and walking toward the rear of the truck, out of the camera view. The third clip showed the pickup truck driving away from the business, pulling a trailer.

Mr. Petty said that he did not immediately replace the trailer because "you can't just go out and purchase one made like that. It's very specialized." He also said that the company that made the trailer "no longer produced that trailer model." In order to replace the trailer, Mr. Petty "purchased raw materials . . . and rebuil[t] the trailer as-is with the same dimensions." He said that he paid $1,450.01 for "the lights, the float socket, the brake parts, the jack, the safety chains, . . . plus the tires and the lu[]g nuts"; $800 for "the powder coating charge," which is "how you protect the steel"; $551.12 for "the tubing and the channels used . . . to fabricate the trailer framing and tongue work"; $256.49 for the "additional steel purchase[d] to . . . run rails down the side"; "[$]22.29 for a "latch for the front"; and $18 for a "tie-down clip." The cost of labor for the employee "who helped me to cut, fabricate and finish was $640," and "the business labor, my labor is $4,250." Receipts for all purchased materials and employee labor related to rebuilding the trailer were exhibited to his testimony. Mr. Petty said that he did not know the defendant and never gave him permission to use the trailer. He also said that the stolen trailer was never returned to him.

During cross-examination, Mr. Petty acknowledged that he purchased the

-2-

trailer used and said that he did not remember how much he paid for it but reiterated that to build a replacement trailer, he spent over "$3,000 in raw materials and finish work" and $640 in employee labor. He added, "I think my labor was going to be kind of counted as irrelevant, even though it isn't."

Union County Sheriff's Office Detective Christopher Carden testified that he reviewed the security camera footage from Mr. Petty's business and that he recognized the defendant as the person seen taking the trailer. Another detective went to the defendant's mother's house and concluded that "[t]he truck at his mother's house . . . is the same vehicle that was seen in the . . . video footage." Detective Carden interviewed the defendant, which interview was captured by the detective's body camera. During the interview, Detective Carden showed the defendant images from the surveillance video and explained to the defendant that the video showed the defendant backing his mother's pickup truck to the trailer and pulling it away. The detective asked the defendant where the trailer was, and the defendant replied, "I don't know about that" and "I didn't take it." The defendant told the detective that he took four to five Xanaxes per day "when I can get 'em" and that he was "messed up" for three to four days.

During cross-examination, Detective Carden acknowledged that during the interview, the defendant "never came straight out and said that he stole the trailer" but said that the defendant "gave affirmation that that was him in his mother's truck taking the trailer." Detective Carden said that he met with the defendant a second time at the defendant's request and that the defendant then admitted to stealing the trailer.

The State rested. After a *Momon* colloquy, the defendant elected not to testify and put on no proof.

On this evidence, the jury convicted the defendant as charged. After a sentencing hearing, the trial court determined the defendant to be a career offender and sentenced him to 12 years' incarceration. Finding that the defendant was on bond in an unrelated case at the time that he committed the present offense and that the defendant had since been convicted in both cases, the court aligned the sentence in this case consecutively to the prior sentence by operation of law.

Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant does not dispute the sufficiency of the evidence as to his taking the trailer and argues only that the evidence is insufficient to support the value of the trailer.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution,

-3-

any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant to this case, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Theft of property valued at $2,500 or more but less than $10,000 is a Class D felony. *Id.* § 39-14-105(a)(3). The value of stolen property is "[t]he fair market value of the property . . . at the time and place of the offense" or "[i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense." T.C.A. § 39-11-106(a)(39)(A). The value of stolen property is a fact to be determined by the jury. *State v. Leverette*, No. M2009-01286-CCA-R3-CD, 2010 WL 2943290, at *2 (Tenn. Crim. App., Nashville, July 26, 2010) (citing *State v. Hamm*, 611 S.W.2d 826, 828-29 (Tenn. 1981)).

The State's evidence established that Mr. Petty could not easily purchase a replacement trailer and that it cost him $3,097.91 in materials, $640 in employee labor, and $4,250 in his own labor to build a replacement trailer. The defendant argues that the State failed to prove that the replacement trailer Mr. Petty built did not exceed the value of the stolen trailer. Mr. Petty, however, testified that he built a trailer to the same dimensions and specifications of the stolen trailer and presented the jury with the receipts for his expenses. The jury resolved any issues of credibility as to Mr. Petty's testimony as was their prerogative. Accordingly, the evidence sufficiently supports the defendant's conviction for theft of property valued at $2,500 or more but less than $10,000.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., PRESIDING JUDGE